James Lewis, having qualified as administrator of the successions of Charles Moran and his wife, Pearl Lewis, obtained an order of sequestration under which the sum of $940 which he claimed belonged to the estates of the decedents, and which was in the possession of Edward Moran and Charles Dilenschneider was seized and the money placed in the custody of the court. Edward Moran answered the petition for the writ of sequestration claiming that the money was his by virtue of a manual gift made to him on or about August 5, 1944 by the decedent, Pearl Lewis, who died after her husband, and that presents the sole issue which is before the court. By agreement of counsel the other defendant, Charles Dilenschneider, was dismissed from the suit. After trial in the district court, judgment was rendered in favor of the defendant in sequestration Edward Moran, and the administrator has appealed.
There are no seriously disputed points of law and the decision of the case has to rest largely on the questions of fact that are involved.
[1] After the defendant Edward Moran had testified as a witness under cross-examination that the money was not handed to him directly by Mrs. Pearl Lewis but given to him through the hands of another person, his sister, it was contended that it was not a valid gift under Art. 1539 of the Civil Code because it was not accompanied by a real delivery as therein required. That Article of the Code however does not itself require a hand to hand delivery in order to make the donation real and effective. It provides that the gift "is not subject to any formality" and in the case of Ory Bros. v. Muller, 14 La. App. 35, 128 So. 903, it is held, and supported by authority cited, that hand to hand delivery is not required to make the manual gift effective, all that is necessary being the intention of the donor to give, accompanied by some form of real delivery.
[2] Another point of law that is raised by counsel for the administrator is that even though there may have been a gift intended and actual delivery made, the donation was nevertheless null as having been made in contravention of Art. 1497 of the Civil Code which strikes with nullity any donation inter vivos, by which the donor divests himself of all his property, he being required to reserve for himself enough for subsistence. That is the donation sometimes referred to as a gift "omnium bonorum" and that being the nature of the one in this case, it is claimed that it is null under the provisions of the Article of the Code cited. The answer made to that contention on behalf of the defendant is that even though the donation was of that nature, the parties contesting it, being only collateral heirs of the decedents, are without standing in court to attack it, as the right to sue for the nullity of such donation is restricted to the donor himself or his forced heirs. Counsel for the administrator concede that under the present jurisprudence that is correct but contend that that jurisprudence is in conflict with prior decisions of the Supreme Court on the question. Of course counsel must realize that this court is controlled by the present decisions of the Supreme Court and must follow the jurisprudence as it is now established. The further point is made that the attack here is *Page 304 
not being made by a collateral heir but by the administrator of the successions. Even so, however, he is making it in his capacity, as administrator representing the heirs, who admittedly are collateral heirs. On all issues of law presented, the ruling of the trial judge was undoubtedly correct.
[3] Coming now to the facts surrounding the alleged manual gift it may be important to consider first the intention of the donors as under the decision cited in the case of Ory Bros. v. Muller, supra, that is an important element.
The facts show that Edward Moran who was a nephew of Charles Moran by blood was taken by this elderly couple to live with them when he was a child four years old. Apparently they reared him as their own and he seems to have been devoted to them as a child. They were people of meager circumstances and this boy rendered all the assistance to the household that is usually rendered by a son of the family. He had a sister somewhat younger than him who also was taken by them and brought up in their home. Edward stayed with them for some ten years when he left to secure employment with Charles Dilenschneider who operated a dairy at Mandeville, several miles from where the Morans lived. He testified that he continued to assist his foster parents to the extent that his earnings would permit and they seem to have appreciated it. Sometime before he died, the old gentleman gave him his watch which he told him he cared for him to have out of the devotion he had shown them. Edward was wearing the watch at the time of the trial of the case in the district court.
This old couple, or rather Mr. Moran, had a large number of relatives as appears from the petition filed by the administrator and still there is no proof to show that any one of them except Edward Moran ever showed them any attention or tried to care for them in any way. We believe therefore that from this alone we can readily deduce an intention on the part of these old people to show their appreciation by making a gift of some sort to him. They had nothing more than this cash money which was derived from the sale of a property and they were living off of the local agency of the State Welfare Department. It would seem entirely plausible therefore that they carried out the intention they had to do something for this young man by giving him this money.
The next question then is whether the proof shows that they actually did give it to him.
As far as Mr. Moran is concerned, there is considerable proof that although he did not actually deliver the money to him, he did express himself to several people as wanting to thus favor him. The testimony of the witness Harry Pettigrew especially impresses us. It is to the effect that sometime before the old gentleman died he paid them a visit one night and they spoke of the kindness of Edward to them and said that if it had not been for him they would have sometimes gone hungry. Then he specifically states that Mr. Moran told him that he wanted his money to go to Edward. Evidently Mr. Moran realized then that he was very sick and might not live very long because it was not but a short time after that, as Mrs. Moranto, Edward's sister, testified, he told her to have her brother come to see them and when he arrived they all three, together with Mrs. Moran, had a conversation in which Mr. Moran stated that he would like for his money to be turned over to Edward because he knew that he would look after Aunt Pearl, meaning Mrs. Moran after he was gone. The old gentleman died either that night or early the next morning.
The day of the funeral, Edward asked his aunt to go and stay with him. She told him that she would not because her brother, whom she referred to as Uncle Jim (James Lewis, the administrator), had already asked her to stay with him. He told her that nevertheless he wanted to continue to help her.
Before leaving the house to go to the old gentleman's funeral there is some testimony about some statements which the old lady may have made concerning the money but it is disputed to some extent. The fact is however that she took the money from out of a mattress where it was hidden and brought it with her to the funeral. After the burial she called Mrs. Moranto to the automobile in which she was sitting and gave her the money and again there is conflict in the testimony regarding what was said. Mrs. Moranto and some witnesses testified that she said to give the money to Edward and of course those witnesses interpreted her as meaning that she was carrying out the wish of her husband and also her intention of making a gift of the money to him. The other witnesses do not dispute that *Page 305 
she said to give the money to Edward but they say they understood her to mean to give it to him to hold for her. At any rate Mrs. Moranto took the money, gave it to Edward, who took it with him to Mr. Dilenschneider and asked him to put it in his safe for safe-keeping. Mr. Dilenschneider would not accept the money unless it was counted in the presence of witnesses and placed in an envelop which he insisted the witnesses also sign.
A few days afterwards Mrs. Moran was taken to the doctor's and on her way through Mandeville she stopped at Edward's and according to some of the testimony of the witnesses for the administrator told him she wanted her money. This is denied by other witnesses who said that Edward was the one who asked her if she needed anything and she said that she needed some money as she was going, to the doctor's. He asked her if $10 would be enough and she said it would be plenty. It is certain that he did not take the $10 from the money in the envelop in the safe but obtained $10 from Mrs. Dilenschneider to give to his aunt. That was the last time except for one visit to her afterwards that he saw his aunt as she died a few days afterwards, exactly twenty days after her husband had died.
There is no proof whatever that any other demand or request was ever made by Mrs. Moran for this money and the only testimony on that point is to the effect that it was requested of him by Harold Lewis, a son of the administrator who seems to be the one pressing this contest over the gift. It was brought out in the testimony that she had consulted a lawyer and that a petition had been drawn to initiate some proceeding to receive the money but it was never filed because the old lady was too feeble to sign it. No lawyer appeared to testify that any such petition was drawn and if there was, certainly it could have been signed and verified by the lawyer who drew it if she was incapacitated. There is also testimony to the effect that a letter was written to Mrs. Edward Moranto, making demand on her by Harold Lewis. He says that he addressed the letter to New Orleans, having obtained her address from his wife. When asked if he mailed the letter he says that he did not but believes his wife mailed it. His wife was then called to the stand and when asked the direct question if she had ever mailed the letter written by her husband to Mrs. Moranto she answers that she did not. Certainly the court cannot be expected to place much trust in proof of this character and when we consider all of the other facts and circumstances which favor the donee, we do not see how we could safely hold that the trial judge, who has carefully analyzed the testimony and the surrounding circumstances himself, has manifestly erred in ruling in his favor.
Judgment affirmed.