(131 So. 674)

**Succession of SANDERS.**

**Opposition of FREEMAN et al.**

No. 30857.

Dec. 1, 1930.

Alvin R. Christovich and William J. Kearney, Jr., both of New Orleans, for appellants.

Ellender & Ellender, of Houma, for appellee Wright.

BRUNOT, J.

On March 12, 1930, Elward Wright, the duly qualified executor of the succession of Mrs. Belle W. Sanders, filed a provisional account of his administration of the estate. In relation to this account and the oppositions of Mrs. Elizabeth Bocage Freeman and the sheriff of Terrebonne parish thereto, counsel for the executor have correctly stated the facts. We quote from their statement the following:

"In said account, the said Executor proposed to pay over to Miss Eloise M. Weathers, as Universal Legatee, certain bonds and jewelry. He further proposed to pay to Miss Eloise M. Weathers bonds aggregating the sum of $29,000.00 par value, together with the sum of $830.00 in cash, being the proceeds of coupons clipped from said bonds under order of Court. The said $29,000.00 of bonds and accrued interest were to be paid over to Miss Eloise M. Weathers for the reason that they were her own personal property, having been given to her by manual gift under the circumstances outlined in the petition accompanying said provisional account.

"The account was opposed by Mrs. Elizabeth Bocage Freeman:—First, on the ground that she had filed an action of nullity, attacking a part of the will of decedent, and, second, on the further ground that Miss Eloise M. Weathers was not the decedent's universal legatee, and, therefore, not entitled to

the bonds and the jewelry in question. She further opposed the payment of the $29,000.00 to Miss Eloise M. Weathers, as proposed by the executor, on the ground that the said bonds were never disposed of by the decedent by donation inter vivos, donation mortis causa, by manual gift or by any other manner provided by law.

"The Sheriff of the Parish of Terrebonne opposed that part of the account wherein the executor proposed to pay to Miss Eloise M. Weathers the sum of $29,000.00, with accrued interest, as a manual gift from decedent, on the ground that said $29,000.00 was not a manual gift and is, therefore, subject to an inheritance tax."

The first ground of opposition, urged by Mrs. Elizabeth Bocage Freeman, to the homologation of the executor's provisional account, is disposed of by the opinion of this court, this day handed down, in the matter involving the validity of page 4 of Mrs. Belle W. Sanders' last will, and numbered 30708 of the docket of this court (ante, p. ——, 131 So. 672).

The trial judge held that Miss Eloise M. Weathers was not the universal legatee of the decedent, but he recognized her as special legatee of the decedent to a net amount not exceeding $15,000, and entitled to the residuary interest, to that amount, of the fund reserved by the decedent, in the codicil to her will dated September 6, 1928, for her expenses. The judge also recognized Miss Eloise M. Weathers as owner of $29,000 of bonds and the accrued interest thereon, as set forth in the provisional account of the executor, and he rendered judgment accordingly. Mrs. Bessie Bocage Freeman appealed from the judgment.

In fixing the status of Miss Eloise M. Weathers, as legatee of the decedent, and in determining whether Miss Weathers acquired

the bonds in question herein by manual gift or as a special legatee, we adopt as our views and quote, with approval, from the trial judge's opinion, the following:

"That portion of decedent's will upon which the executor relies to justify his recognition of Miss Weathers as universal legatee is found in the language of a codicil under date of September 6, 1928, viz.:

" 'I wish to make some changes in my will of July 1st, 1927.

" 'In making bequests I failed to provide for my own expenses—To do so will make deductions as follows:

" 'Mrs. Reymond $2,000 instead of $4,000. Mrs. Granberry $2,000 instead of $4,000—

" 'Mrs. Bessie Shaffer $2,000 instead of $4,000—

" 'T. A. Shaffer $1,500 instead of $3,000

" 'Edna Shaffer Webb $8,000 instead of $10,000

" 'Isabel S. Lewis $2,000 instead of $4,000

" 'Elizabeth Shaffer $2,000 instead of $4,000

" 'B. F. Shaffer $1,500 instead of $3,000— Bessie Bocage Freeman, $1,500 instead of $3,000

" 'To John Shaffer $1000.

" 'Anything left from my expenses is to go toward a new fence and other improvements on the property under the direction of Eloise M. Weathers.'

"The particular language relied upon and quoted by the executor is the paragraph:

" 'Anything left from my expenses is to go toward a new fence and other improvements on the property under the direction of Eloise M. Weathers.'

"Was it the intention and endeavor of the decedent, by the employment of the above language, to institute Miss Weathers as her universal legatee?

"It may be noted at this time that, at the time of her death, the decedent was the owner and possessor of a lot of jewelry subsequently appraised at a value of several thousand dollars; this jewelry was found in her bank box, each piece separately wrapped and bearing an inscription in the handwriting of decedent which seems to indicate that she intended such piece to be eventually received as a gift from her to the person whose name appeared thereon—this jewelry is not mentioned or referred to by any language in her last will and testament. It is a part of the assets which the executor now proposes to turn over to Miss Weathers as the universal legatee.

"Since this jewelry was evidently intended by the decedent to go to the persons in whose names she had labelled it—though she may not have succeeded in legally indicating her wish—it is a fair assumption that she did not rely upon it or its value to assist in meeting the charge of her expenses 'during life' after the making of her codicil above quoted. It is therefore patent that the jewelry could not have been present in her mind as any part of 'Anything left from my expenses,' when she penned said codicil.

"But, getting back to the language in question, the first task is to determine just what the decedent had in mind when she employed the expression 'Anything left from my expenses.'

"Ordinarily, 'expenses' are a 'liability,' rather than an asset that may be bequeathed to the enrichment of another. Yet the context of her language makes it clear that the testatrix had in mind a probable asset. A reading of her entire will will justify no other conclusion than that she intended to leave to Miss Weathers any possible remainder of a definite asset of some value. If possible, the language must be interpreted and given effect as referring to an asset of possible value, to be turned over to Miss Weathers—if any portion of it remained at the time of the testatrix's decease.

"Anent the possibility of placing such a construction upon the expression, her introductory remark in the confection of the codicil is enlightening—thus:

" 'In making bequests I failed to provide for my expenses—To do so will make deductions as follows.' 'To do so'—to do what? 'To provide for my expenses,' I will make deductions from the bequests I have already recited.

"Having discovered that the bequests theretofore enumerated would so trench upon her estate as not to leave her sufficient assets upon which to live and maintain her household expenses, and still permit her to be certain of leaving an estate able to pay the enumerated legacies, she had determined to and was then proceeding to reduce said bequests for the sole purpose of erecting 'an expense fund' out of and by which she intended to live and maintain herself and her home for the remainder of her life.

"In the codicil, she did reduce certain bequests theretofore declared to the extent of a total of $16,000. She added an additional bequest (to John Shaffer) of $1,000, so that the net reduction in bequests amounted to a total of but $15,000. Her declared purpose in making the codicil was 'to provide for my expenses'—and to preserve a body of assets out of which she could live and meet her expenses. She evidently deemed $15,000 adequate to that end. This reservation of $15,000 then existed in her mind as the assets out of which she would meet her expenses in the future—plus, of course, any annual revenues that her entire estate might yield her, pending actual demise.

"That being the situation and the evident state of her mind, it is obvious that when she thereafter referred to 'anything left from my expenses' she had in mind this particular reservation (expense fund) of $15,000, which she was then deducting from the aggregate of special bequests theretofore enumerated. Or, in effect, she declared that if anything of this $15,000 remains at my death it 'is to go towards a new fence and other improvements on the property under the direction of Eloise M. Weathers.

"It may be assumed, as intimated above, that the decedent enjoyed some yearly earnings from her assets which she was able to utilize in meeting expenses, and that, in withdrawing only $15,000 from the first enumerated bequests for the purpose of assuring herself an adequate expense fund, she did so with the conscious knowledge of and reference to her usual annual revenues, as well as the value of any other actual revenue bearing assets that she may have refrained from covering in value when she confected her first list of bequests—the list which she was afterwards constrained to 'reduce'; but, in the light of the 'labels' found upon the jewelry after her death, and in view of the obvious fact that these articles were not revenue bearing, it is extremely improbable that she ever expected to resort to the jewelry as a source of support or maintenance for herself—or that she had the value of the jewelry in mind when making a calculation and reservation of assets out of which she expected to live to the balance of her days. It is not possible to conclude that she had the jewelry in mind when she declared that 'anything left from my expenses' should be devoted to the improvement of the property left to Miss Weathers.

"Although the decedent deemed it wise to retain, in addition to her annual revenues and any other active revenue bearing assets not needed to meet her bequests, at least a total of $15,000 as an 'expense fund' adequate to meet the needs of the balance of her life, she was also· evidently alive to the realization that human life is uncertain and that her remaining days on earth might be terminated at almost any time—perhaps long before she should have expended the $15,000 or any considerable portion thereof. Realizing the possibility of such a contingency, she desired and took pains to declare that 'anything remaining from my expenses' meaning (from the fund reserved and set up for such purpose) should be devoted to the improvement of the property which she had already declared should go to Miss Weathers—In short, she desired and declared that Miss Weathers should be the sole beneficiary of the remainder of such fund. Her meaning and intent is unmistakable—it must be respected.

"But the declaration falls short of instituting Miss Weathers her universal legatee.

"Clearly, Miss Weathers is made the residuary· legatee of the remainder of the 'expense fund.'

As to the second point in controversy, the executor's proposal to recognize Miss Weathers as the owner in her own right of certain bonds aggregating a par valuation of $29,000:

"The language of the testatrix in referring to this item is probably responsible for the confusion that has gathered around it. In her will, she specifically bequeaths to Miss Weathers $29,000. Then she immediately makes it plain that she is referring to a collection of bonds which she described as having already been presented to Miss Weathers as early as 1925, some two years before the making of the will. The anomalous situation

is apparently presented, wherein the decedent names Miss Weathers as the beneficiary of a specific bequest, mortis causa, and in the next breath admits and declares that Miss Weathers is already the owner of the object (the $29,000, par value, bonds) by way of a previous manual gift which she acknowledges to have made on a specific date.

"Since Mrs. Sanders was the unhampered owner of the bonds in question with the undoubted power of disposition, she had the unquestioned right and power to make them the subject of either a manual gift or of a disposition mortis causa. She admits that they had been transferred to Miss Weathers by manual gift. If that be true, neither Mrs. Freeman nor other heirs have any legitimate complaint. If, for any reason, it be true that the manual gift was not perfected in legal form and did not amount to a transfer of legal title to Miss Weathers, it still remains true that the will assigns them to Miss Weathers as a special legacy, mortis causa—again, neither Mrs. Freeman or other heirs have any legitimate grievance.

"There is no doubt that Mrs. Sanders intended that Miss Weathers should receive either the bonds mentioned as a manual gift made in 1925 or $29,000 as a special legacy. While it may or may not be true that Mrs. Sanders entertained some question as to the efficacy or effect of the acknowledged manual gift of 1925, she was at least determined to 'make certain' that Miss Weathers should benefit to the extent of their par value—at the same time, she made it perfectly clear that the bequest of $29,000 recited in the will should not be considered and treated as an 'extra portion' in addition to the acknowledged previous manual gift. Or, in other words, if Miss Weathers claimed and was accorded ownership of the bonds by reason of

the manual gift, she could not, in addition thereto, claim and be paid another $29,000 because of the language of the will. Or, if the manual gift failed of legal justification, then the value of $29,000 should be paid to her as a special legacy.

"That view of the purpose and intent of the decedent is obvious and convincing, and necessitates the rejection of the opposition of Mrs. Freeman, unless it should result that the bonds now claimed by Miss Weathers as a manual gift are worth in excess of $29,000. In that event, Mrs. Freeman would have an interest in challenging the legality of the manual gift, thus forcing the inclusion of the value of the bonds into the mass of the succession effects, and restricting Miss Weathers to the receipt of a special legacy of $29,000—thus leaving in the succession mass the surplus value of the bonds in excess of $29,000. But neither the record nor the appraisement justify the conclusion that the present or obtainable value of the bonds claimed are in excess of their par value, $29,000. Indeed, the appraisement places them at a less present value.

"The opponent, the sheriff and ex officio inheritance tax collector is in a slightly different position. If Miss Weathers takes by authority of the bequest recited in the will, she is liable to an inheritance tax thereon. If she is recognized as the owner of the bonds, as proposed by the executor, she is not liable to the payment of an inheritance tax thereon, unless it be made to appear that the gift was made in anticipation of death and for the purpose of evading an assessment and collection of an inheritance tax.

"An earnest perusal of the record, including the testimony of the witnesses called, particularly that of Mrs. Webb, a person without interest (unless, perchance, against Miss

Weathers) in this particular issue, taken together with the personal mental attitude of the decedent herself as reflected and indicated by the language of her will, and with the declarations under oath and cross-examination of Miss Weathers, in whose personal integrity and high sense of honor the court has every confidence, combine to compel the conclusion that the transaction of 1925 was intended and accepted by both parties thereto as amounting to a bona fide manual gift; and that there was a legal 'giving' responded to by a legal 'acceptance.'

"The circumstance that Miss Weathers thereafter left the bonds in the box of decedent, though, perhaps, not usual and ordinary, is explained to the satisfaction of the court; nor is it affirmatively made to appear that the gift was made in anticipation of death, or for the purpose of relieving the recipient thereof of liability to an inheritance charge.

"The court is satisfied that, since the date of their original gift to Miss Weathers, she has been, until decedent's death, in perfect and unrestricted control both of the bonds and of the revenue accruing therefrom, and that it is immaterial and no concern of the court or of any one what she may or may not have chosen to do with the coupons clipped either from the original bonds or those for which they were subsequently exchanged.

"The conclusions hereinabove arrived at necessitate rejection of the oppositions to the executor's proposal to recognize Miss Eloise M. Weathers as the owner in her own right of the bonds aggregating a par value of $29,-000 claimed by her and found by the executor in the bank box of the decedent, which bonds, as described and identified by the executor in his provisional account, he now proposes to turn over to the said Miss Weathers.

"They likewise compel maintenance of the opposition to the executor's proposal to recognize and settle with Miss Eloise M. Weathers, as the universal legatee of the decedent; and they indicate and dictate recognition of Miss Eloise M. Weathers as the residuary legatee of such portion of the 'expense fund' created by the decedent by her declared deductions on September 6, 1928, from bequests previously declared—which said fund aggregated $15,000 plus the accruing revenues from her entire estate—as remained unexpended at the date of her death and after meeting the demands of the special bequests set up in the will plus other legal liabilities against the succession effects; provided that the amount to be paid under this item shall not exceed the sum of said net deduction, $15,000, and that neither the jewelry, its value, nor the value of any asset not in the actual possession and enjoyment of the decedent—either in the original or as substituted by barter or exchange—on the date of said deductions and establishment of said 'expense reserve,' is included in the amount to be paid in satisfaction of said bequest."

For the reasons stated, the judgment appealed from is affirmed, at appellant's cost.