563 So.2d 502 (1990)
SUCCESSION OF Ruth Helen YOUNG.
No. 89-CA-1893.
Court of Appeal of Louisiana, Fourth Circuit.
May 31, 1990.
Rehearing Denied July 19, 1990.
*503 Susan F. Clade and Daniel Lund, III, Simon, Peragine, Smith & Redfearn, New Orleans, for Samuel I. Rosenberg and Louis Harris, appellants.
Milton E. Brener and R. Justin Garon, Garon, Brener & McNeely, New Orleans, for William Manschot, appellee.
Before KLEES, WARD and BECKER, JJ.
WARD, Judge.
This appeal arises over the disputed ownership of nineteen negotiable bearer bonds placed by Ruth Helen Young in a safety deposit box approximately one week prior to her death by suicide.
In this appeal by the co-executors of her estate we are asked to review the Trial Court's determination that Ms. Young made an inter vivos donation of those bonds to William G. Manschot, Jr.
Mr. Samuel Rosenberg, as one of the executors of Ms. Young's last will and testament seeks to include in Ms. Young's estate municipal bonds which William Manschot, Jr. contends were an inter vivos donation to him.
The facts are largely uncontested, and the case was tried on stipulations that if Samuel Rosenberg and William Manschot were called to testify they would testify as set forth in statements of fact of each and that William Manschot's cross-examination would be the same as his testimony in his deposition.
Ruth Helen Young died testate on February 13, 1989. For approximately 20 years prior to her death Ms. Young and Mr. Manschot enjoyed a close personal and business relationship. They traveled together often under assumed names; and as business associates, each owned 50% of the capital stock in Gateway Productions, Inc., *504 a company engaged in the production of educational audio-visual materials.
By testament Ms. Young bequeathed to Mr. Manschot immovables located at 3009-11 Magazine Street, as well as her 50% of the capital stock in Gateway Productions, Inc. Ms. Young bequeathed a particular legacy to her mother, and bequeathed to four charitable organizations the residual of her estate. Ms. Young also named William Manschot, Jr. as beneficiary of a life insurance policy.
Following Ms. Young's death, Mr. Rosenberg began to marshall the property of her succession to file a detailed descriptive list of the decedent's assets with the Court. During the course of these endeavors, Mr. Rosenberg discovered matured bond interest coupons which had been clipped from six separate municipal bonds, but he was unable to locate the bonds. Mr. Rosenberg contacted Mr. Manschot and requested that he search Ms. Young's desk and files at Gateway's office in an attempt to locate, among other things, the bonds from which the coupons had been clipped. The next day Mr. Manschot removed the bonds from a safety deposit box that Ms. Young had leased from Security Center. Although he forwarded bank statements and other succession items to Mr. Rosenberg, Mr. Manschot did not disclose to Mr. Rosenberg either the existence of the box nor its contents. It was only after Mr. Rosenberg discovered the existence of the box that Mr. Manschot disclosed, through his attorney, that he had entered the box after Ms. Young's death and removed the bonds.
Although Mr. Manschot was in possession of the bonds, he refused to surrender them to Mr. Rosenberg, but instead, intervened in the succession proceedings, seeking a judicial declaration that he was the owner of the bonds as the recipient of an inter vivos donation from Ms. Young. The Trial Court rendered judgment in favor of Mr. Manschot, holding that Ms. Young made "constructive delivery" of the bonds by 1) "placing the key" to the safe-deposit box in Manschot's desk drawer; 2) having Manschot "sign the signature card" for the safe-deposit box; and 3) telling Manschot "the number" of the safe-deposit box.[1]
The Executor contends an inter vivos donation did not occur because 1) Ms. Young did not irrevocably divest herself of the bearer bonds during her lifetime; 2) Ms. Young did not deliver the bonds to Mr. Manschot; 3) Mr. Manschot did not accept the bonds during Ms. Young's lifetime; and 4) there was no donative intent. We have reproduced Mr. Manschot's statement by which he lays claim to the bonds.
I am 59 years of age. I have been very close to Ruth Young since moving here in May of 1967, at which time we were both working at the WYES TV Station. We both left WYES on December 1, 1969 to begin work together as Gateway Productions and we incorporated in 1970. The corporation did not really make any substantial money until 1984.
Beginning about the time her father died, in 1975 or 1976, Ruth assumed the management of Young Engineering Company, though she also stayed with Gateway. From the death of her father, she worked essentially one-half day at each place, Young Engineering and at Gateway. Gateway originally rented space. In March 1980, Ruth bought 3011 Magazine Street and Gateway occupied offices in that building from May, 1980.
During the course of our work together at Gateway, I mentioned to her, on various occasions, my concerns about money and finances, particularly the fact that Gateway had no medical insurance, or pension plan. Ruth was quite wealthy in comparison to me. On one occasion when I was hospitalized, she personally paid my bill. On numerous occasions when I expressed such concerns, and sometimes on other occasions, she would make comments to the effect that I should not be troubled about finances, as if anything happened to her that she intended to take care of me. She also mentioned on several occasions, secret *505 places where money or other valuables were placed, and that whatever she had placed in such locations would be mine and would be sufficient to take care of me. I paid very little attention to these statements of hers, as I thought it extremely unlikely that she would survive me[2], as she was considerably younger.
I recall particularly one occasion in the late 1970's when reference was made to a box behind her desk at her office at Young Engineering Company and she stated that it was marked "Gateway".
Gateway is a corporation owned jointly by Ruth and myself. She had an office at Gateway as well as at Young Engineering which was a business founded by her father.
In December, 1988, on one occasion when I came to work at Gateway, my desk in my office was covered with numerous bonds. When I asked Ruth what all of that was, she said that they were "for me to know and you to find out." This was typical of her personality which was sometimes playful, sometimes mysterious. She then picked up the documents and put them in an accordion-type file.
Approximately one week before her death, on February 6, 1989, I met Ruth for lunch at the Food Court at the Place St. Charles. Ruth was late, which was not unusual. She rushed in with a card and didn't sit down, but asked me to sign it. She asked me to use a name that I had used from time to time when she and I traveled together, namely, "Manship", instead of my real name, Manschot. There are scratch outs on this card that I signed, as I had first signed my real name and then she vacillated as to whether she wanted me sign that or Manship, and she finally decided on Manship.
I did as she asked, and she stated that she was opening a box and that it would be numbered by my birthdate so that I would not forget it. She also told me not to worry about a key. She then left, saying she was going to "Security" and would be right back. She was gone about ten minutes. When she came back we had lunch and there was no talk about the card, then or later.
When I came to work on the morning of Monday, February 13, 1989, I found Ruth lying on a couch in our office. She and I shared an office and our desks were right next to each other. I went over to the couch to try and wake her and found that she had shot herself. This was an extremely traumatic shock to me, from which I have not yet recovered.
About nine days after Ruth's death, remembering the discussion at lunch and the signature card, and that Ruth had talked about "security", I called Security Homestead. The party I talked to said that they had no reference to an account with Ruth or me and suggested I call Security Center. I called the Security Center and spoke to a lady named Jan. I remembered what Ruth had told me about the box number that she intended to use. My birthdate is May 8, 1929 and I correctly told Jan that the box number would be 50829. This was, in fact, the box number. Jan told me that I had to have a key, and consequently I started looking for a key.
I looked through Ruth's desk, as there was one place in Ruth's desk where all keys were kept. I saw one that I thought could be a safety deposit box key and took it to a nearby locksmith. He said it was a suitcase key.
I looked in her desk again, but could find nothing. I called back and asked Jan if there wasn't some alternative. But Jan said that there was none, that I had to have a key.
The next day when I opened my desk drawer when I came to work, I looked casually through the drawer and saw an FNBC envelope. Neither I, nor Gateway did business with FNBC. There was a key in the envelope, flat with no inscription on it. I went back to the locksmith *506 and he said it was a safety box key. I then went over to Security Center, but I signed by real name and they refused to let me in because they said the name was not correct.
That afternoon, I called back and talked to Jan and said that I recalled that I had signed a different name, though I had temporarily forgotten. She asked questions on the phone such as "give me an address". I gave the addresses of Gateway, Young Engineering Company and a boathouse that Ruth owned, and finally the name of Ruth's home address, which I had not thought she would have given. But when I gave the home address, Jan said, "come on down, we have a match", or something to that effect.
When I arrived at Security, there was another employee, a male, with Jan and I signed and Jan looked at the card and said it was close enough. By that she pointed out that I had signed G. Manship on the card originally, but that, upon entering I signed W. Manship, which is the correct name. G is my middle initial.
They asked if I wanted to take things out and I said no, I wanted to make an inventory. I went back once to see if I could add my wife's name to the box, picked up a card and brought it to her, which she signed at the house. I brought it back and put my wife's U.S. Treasury Bonds in the box, at her request. These Treasury bonds are payable to my wife and me jointly.
It has since been called to my attention that there is printed language at the top of the signature card to the effect that I was certifying that all lessees of the box were alive to the best of my knowledge. I never noticed this language when I signed and, on the contrary, I had told Jan that I was there precisely because Ruth, the co-lessee, had died.
Subsequently, I learned from Sam Rosenberg, attorney for the succession, that he knew of the box and the bonds, and I went back to the box and removed all of the bonds and kept them in my possession. There were several reasons for this, the most important of which was, as far as Ruth and I knew, no one knew about the closeness of our relationship, she having left to me by will only the property connected with our jointly owned business. Particularly, Ruth was very concerned that her mother not know of her close relationship to me. This was always of the utmost importance to her. It was my belief, based on all of the circumstances, that Ruth did not want it known that she had given me the bonds. It was for this reason that I removed them.
Other facts not contested show Ms. Young was the sole lessee of the Security Center box, and the Security Center lease agreement indicates two or more keys were issued to Ms. Young. Exhibit F1. Further, when Mr. Manschot gained entry to the box he removed and destroyed a descriptive list of its contents prepared by Ms. Young and substituted his own descriptive list. Deposition of Manschot, P. 91.
A donation inter vivos is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. La.C.C. art. 1468. The burden of proving the donation is on the donee, and the proof must be strong and convincing. Succession of Woolfolk, 225 La. 1, 71 So.2d 861 (1954); Butler v. Reddick, 431 So.2d 396 (La.1983).
A donation inter vivos of corporeal or incorporeal things is null unless done in the form of an authentic act. La.C.C. art. 1536, 1538. An exception exists when there is a manual gift of a corporeal movable accompanied by a real delivery. La. C.C. art. 1539. In the past our Supreme Court has held a donation of bearer bonds is a nullity unless accomplished through an authentic act, Succession of Miller, 405 So.2d 812 (La.1981). Immediately after Miller was decided, the Legislature by Act 452(1) of 1982, La.R.S. 10:3-201(4), abrogated the need for an authentic act for donations of negotiable instruments, making Donations Inter Vivos subject to the Commercial Laws of Louisiana R.S. 10:1-101 et seq.
A negotiable instrument payable to bearer is negotiated by delivery. La.R.S. 10:3-202(1). *507 "Delivery" is defined with respect to instruments, documents of title, chattel paper or securities to mean "voluntary transfer of possession, actual or constructive, from one person to another." La.R.S. 10:1-201.
Thus, a transferor with donative intent to divest himself or herself irrevocably of a negotiable instrument may make a valid donation by delivery of the instrument.
Considering first whether there was sufficient delivery, real delivery by a manual hand to hand exchange is not necessary.
"Delivery" with respect to instruments... means voluntary transfer of possession, actual or constructive, from one person to another. La.R.S. 10 § 1-201. General definitions.
Nonetheless, under Louisiana jurisprudence and other jurisdictions, sufficient delivery means relinquishing control or dominion over the property and placing it within the control or dominion of the person whom the deliverer intends to have control of the property thereafter.
In this case, the evidence does not establish that Ms. Young, prior to her death, irrevocably divested herself of the bonds. While each case must turn on its own facts, there are similar cases which are persuasive. Bergeron v. Bergeron, 411 So.2d 1183 (La.App. 4 Cir.1982) and Succession of Diffey, 543 So.2d 131 (La.App. 2 Cir. 1989).
The Bergeron Court was called upon to determine whether a father's opening a bank account in both his name and that of his minor son constituted a donation inter vivos to the minor. The Court concluded that because only the father had the power to withdraw and control the funds in the account and because the intent to donate at the time the account was opened and deposits made appeared to create only a conditional donation, there was no irrevocable divestiture of the funds by the father, hence no transfer or delivery and therefore no valid donation.
In Succession of Diffey, supra, three of decedent's children claimed the funds in a bank account as a donation to them by decedent. Prior to the decedent's death the funds in question were in two accounts in the decedent's name, with his daughter having authority to sign on the accounts. The daughter, without decedent's consent, combined the funds in the two accounts transferring them into a "Golden Passbook Account" in her name and her brother's name. When the decedent learned of the transfer, he added his name and his other son's name to the account, which then necessitated all four signatures in order to withdraw funds. Decedent died some 20 months later without changing the status of the account. Decedent's children argued that by not altering the account he intended a manual gift of the funds to them. The Court rejected their argument holding that the children failed to prove donative intent and irrevocable divestiture. "The fact that decedent maintained control over the account until his death indicates that he did not divest himself, at present and irrevocably, of the account purportedly given." 543 So.2d at 133.
In Succession of Zacharie, 119 La. 150, 43 So. 988 (1907) the decedent appointed his sister his agent for a sale of real estate he owned. Pursuant to the decedent's instructions, his sister deposited the funds from the sale into a joint account in her name and that of her sister. Upon their brother's death, the sisters claimed a donation of the funds in the account by manual gift. Considering the issue of "real delivery" under C.C. art. 2477[3] the Court noted:
There can be no question of the fact of delivery, since the fund was placed in the power and possession of the two sisters. Civ.Code Art. 2477. The fund was put beyond the control of the donor, and he could not withdraw the same, or any part thereof, without the written consent of *508 the donees. The manual gift thus made was irrevocable.... 43 So. at 990.
The present case presents no facts to establish either a relinquishment by Ms. Young of control and dominion over the bonds or the transfer of said dominion and control of the bonds to Mr. Manschot. There was no constructive delivery to Mr. Manschot because he was not vested with control over the bonds during Ms. Young's lifetime. The record indicates Ms. Young clipped the matured coupons from the bonds before she placed them in the safe deposit box. Consequently, prior to her death, Ms. Young exercised unrestricted control of the bonds and the revenue produced therefrom. See Succession of Sanders, 171 La. 569, 131 So. 674 (La.1930).
In the present case, like Bergeron and Diffey, the decedent retained control over the safe-deposit box and its contents prior to her death. Ms. Young did not explain to Mr. Manschot whether the signature card he signed was for a safe-deposit box or a bank account. Neither did she inform him of the location of the box. He remembers only a passing reference to "Security" and after her death, mistook Security Homestead as the depository of the account. Moreover, an examination of the Security Center lease agreement executed by Ms. Young indicates the issuance of two keys to the box. Since only one key was found after Ms. Young's death it is reasonable to conclude she retained possession of a key, additional evidence that she intended to retain, not relinquish, dominion and control of the box and its contents.
Even assuming Ms. Young placed a key to the box in Mr. Manschot's desk prior to her death, by not informing him of this fact she effectively maintained control over the box during her lifetime.
The lower court erred in concluding Ms. Young's divestiture of the box and contents by "having [Manschot] sign the signature card." Ms. Young paid the rental fee on the box and was listed as the sole lessee. The name "G. Manship" on the signature card only shows that "G. Manship" (Mr. Manschot) was another person in addition to Ms. Young who could gain access to the box. Allowing Mr. Manschot access to the box does not constitute proof Ms. Young intended to terminate her ownership of the contents of the box and donate them to him.
Moreover, Ms. Young informed Mr. Manschot that "it" (not specifying account or box) would bear a number equivalent to his birth date. He did not know what "it" was that would bear that number, the location of "it", or what was in "it" until after her death. Although she may have told Mr. Manschot the number of the account, Ms. Young nevertheless was the only person who knew there was a box, its location, contents and the means to gain access.
We conclude that the acts which the lower court relied upon in determining a donation inter vivos occurred did not constitute irrevocable divestiture by Ms. Young of control or dominion over the bonds.
Even so, there is scant evidence of acceptance by the donee, Mr. Manschot. The only act which may possibly be construed as acceptance is his signature on an entry card, and this, we hold was not sufficient.
Finally, Counsel invites us to view all of the facts together with the suicide of Ms. Young, to prove a donation inter vivos. Those facts, at their best, however, only show a donative intent with a conditional delivery to take place only upon the death of Ms. Young. In other words, a donation mortis causa. La.C.C. art. 1469. A donation mortis causa may be made only by last will and testament. Every other form is abrogated. La.C.C. art. 1570.
For the foregoing reasons, we hold that there was no donation inter vivos of the bonds in question by Ms. Young to Mr. Manschot. Therefore, the judgment of the Trial Court is reversed and judgment rendered in favor of the co-executors of the Succession of Ruth Helen Young, ordering the Executors to include the bonds in question in the detailed descriptive list of assets and in due course to disperse the bonds in *509 accord with the dictates of the decedent's will.
REVERSED AND RENDERED.
NOTES
[1] The number on the Security Center box containing the bonds was "A221" and the lease agreement for that safe-deposit box was for a numbered account bearing the number "50829."
[2] In actuality Manschot was several years Ms. Young's senior. Manschot meant that it was unlikely that he would survive Ms. Young. This error was corrected in Manschot's deposition.
[3] Former C.C. art. 2477 [Code of 1870] on which the Zacharie Court relied provides that in the case of sales or exchanges of movable property, delivery may be actual or constructive. The Zacharie court characterized the "delivery" of the deposited funds as "constructive", as contemplated by that former codal provision.