ESTATE OF DARWIN A. MILLER, DECEASED, VIRGINIA P. MILLER, TESTAMENTARY EXECUTRIX AND SURVIVING SPOUSE, AND VIRGINIA P. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 5875-88
United States Tax Court
T.C. Memo 1991-515; 1991 Tax Ct. Memo LEXIS 564; 62 T.C.M. (CCH) 997; T.C.M. (RIA) 91515; October 9, 1991, Filed *564 Decision will be entered under Rule 155. Michael E. Guarisco, David A. Aymond, and Richard K. Leefe, for the petitioners. Stevens E. Moore, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6659 [1]
1981
$ 820,422.00
$ 246,126.60
1982
154,623.00
46,386.90
1983
182,966.00
42,854.40
1984
69,257.50
15,014.70
1985
107,920.70
26,603.16
After concessions by the parties, the issues for decision are: (1) Whether the burden of proof on certain issues is on respondent; (2) whether petitioners are entitled to a deduction for purported charitable contributions of animal trophies made to the *565 State of Louisiana during the years in issue; and, if so, (3) what is the amount of the allowable deductions; (4) whether the charitable contribution deductions claimed by petitioners are limited to the fair market value of the animal trophies reduced by the amount of gain which would not have been long-term capital gain if the animal trophies had been sold at their fair market value; (5) whether petitioners can deduct expenses incurred in connection with hunting and mounting animal trophies that they purportedly donated to the State of Louisiana; (6) whether petitioners can deduct expenses associated with the care and maintenance of the animal trophies incurred after they purportedly donated the trophies to the State of Louisiana; (7) whether petitioners are liable for additions to tax for valuation overstatements under section 6659 for the taxable years 1981, 1983, and 1984; and (8) whether petitioners are entitled to deductions for the taxable years 1983, 1984, and 1985 for expenses incurred in connection with the operation of the Ram Head Hunting Lodge. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first and second stipulation of facts and the *566 attached exhibits are incorporated herein by this reference. Petitioners Darwin A. Miller and Virginia P. Miller were husband and wife and resided in Houma, Louisiana, at the time of filing their petition in this case. On November 26, 1989, Darwin A. Miller died. On June 1, 1990, this Court ordered that the Estate of Darwin A. Miller be substituted as a party petitioner for the deceased Darwin A. Miller. All references to petitioner in the singular shall hereinafter refer solely to Darwin A. Miller. For the taxable years 1981 through 1985, petitioners timely filed their joint income tax returns. During the years in issue, petitioners claimed deductions for "noncash" charitable contributions which were identified as "museum donations" on Schedule A of these returns. Petitioners did not designate the recipient of the "noncash" contributions on their 1981 and 1982 tax returns. On their 1983, 1984, and 1985 tax returns, petitioners stated that the State of Louisiana received the "noncash" contributions. [2] Petitioners also claimed deductions for certain "cash" contributions for the taxable years 1981 through 1985. On their 1981, 1982, and 1983 tax returns, petitioners did not *567 indicate the nature of these "cash" contributions. On their 1984 and 1985 tax returns, petitioners identified the "cash" contributions as "Hunts and Taxidermy," "From K-1 Entity," and "Misc. Contributions." Respondent disallowed all of the "noncash" contributions claimed on petitioners' 1981 through 1985 *568 income tax returns. Respondent disallowed all of the deductions claimed as "cash" contributions, except those items identified as "Misc. Contributions," on petitioners' 1981 through 1985 tax returns. [3]
The following table reflects the "cash" and "noncash" contributions that petitioners reported on their 1981 through 1985 tax returns: Petitioners' Reported Contributions
Year
Cash
Non Cash
Total
1981
$ 301,498
$ 1,229,650
$ 1,531,148
1982
255,416
54,050
309,466
1983
151,146
134,550
285,696
1984
138,825
60,300
* 199,125
1985
67,233
44,575
* 111,808
Totals
$ 914,118
$ 1,523,125
* $ 2,437,243
*569 Donation of the Animal Trophies
Petitioner has hunted and trapped all his life. In the 1970s, petitioner began game and sport hunting. Petitioner has hunted throughout the world including Africa, Russia, Mongolia, Iran, Canada, Australia, New Zealand, Alaska, and South America. Sometime during the 1970s, petitioner began thinking about establishing a wildlife museum. Petitioner wanted to place full-body trophies of animals that he shot on his hunting trips in this museum. Petitioner felt that a wildlife museum would educate and benefit the children of Louisiana. Petitioner decided that the way to accomplish his goal would be to hunt the animals, have them mounted, and then hold them for the State of Louisiana (the State) until the State could build a facility to house the trophies. In 1978, petitioner arranged a meeting with the Governor of Louisiana, Edwin W. Edwards (Governor Edwards). [4] Prior to this meeting, petitioner had never met Governor Edwards. During this meeting, petitioner explained his idea of a wildlife museum to Governor Edwards. Governor Edwards asked petitioner if he could help. Petitioner replied that an official designation by the Governor would *570 help him gain access to hunting areas that were not otherwise accessible. Petitioner could use this access to hunt and collect animals which would later be placed in the wildlife museum. Accordingly, on June 29, 1978, Governor Edwards designated petitioner "The Official Big Game Hunter of Louisiana." Governor Edwards made the designation in order to assist petitioner in obtaining access to restricted hunting areas. The designation did not direct petitioner on when and where to hunt, nor did the State agree to pay petitioner's hunting expenses. Moreover, petitioner did not believe that he was under a legal obligation to donate the trophies he obtained with the help of the State's designation. In 1979, petitioner again met with Governor Edwards. During this meeting, petitioner took Governor Edwards into a building located behind petitioner's house. The building housed trophies *571 collected by petitioner. Petitioner told Governor Edwards: "these are your animals." The collection impressed Governor Edwards, and he told petitioner that he would try to obtain funding for a State facility to house the trophies. In a letter dated January 9, 1980, Governor Edwards accepted the donation of "the animals listed." [5]
During the years in issue, 1981 through 1985, petitioner continued to hunt, mount, and place animals in the building behind his house. The animals were never removed from the building. During the years 1981, 1982, and 1983, no State official accepted the donations which petitioner claims to have made in each of those respective years. When Governor Edwards resumed being Governor in March 1984, the State had no record of the donations which petitioner claimed to have made during these years. During the period between March 1981 and March 1984, petitioner unsuccessfully attempted to contact Louisiana Governor *572 Treen about the animal trophies which he intended to give to the State. Sometime prior to February 16, 1984, respondent began examining petitioner's deductions for the alleged donations. Respondent requested an opinion from the Louisiana Attorney General's office on whether petitioner had made a valid donation of the trophies under Louisiana law. Respondent provided the Attorney General with a copy of the letter from Governor Edwards dated January 9, 1980. On July 6, 1984, the Attorney General informed respondent that, based on the information provided by respondent, petitioner had not made a valid donation to the State. Governor Edwards was reelected Governor of Louisiana and took office in March 1984. On December 29, 1984, petitioner and Governor Edwards executed a notarized document entitled "Donation Inter Vivos." In this document, petitioner states, under oath, that he donated various trophies during the years 1979 through 1983 to the State and that the State accepted the donations. The document also states that because the State was unable to store the trophies, it requested that petitioner "maintain the property until appropriate facilities were acquired and made available." *573 [6] The document lists the trophies which petitioner claims he donated to the State during the years 1979, 1981, 1982, and 1983. The document does not state how the donations were made or who accepted the donations on behalf of the State during those respective years, nor does it give specific dates on which the purported donations were made. On December 30, 1985, the same parties executed a similar "Donation Inter Vivos" which covers the trophies petitioner allegedly donated to the State in 1985. [7]
On March 26, *574 1985, petitioner petitioned the 32d Judicial District Court (State Court) for an order declaring that the trophies which were listed in the 1984 Donation Inter Vivos were legally donated to the State. In its answer, the State denied that petitioner donated these items to it. In January 1986, petitioner moved for summary judgment and, in April 1986, his motion was granted. In holding for petitioner, the State Court did not find that a valid donation had in fact occurred. Instead, the State Court ruled in favor of petitioner on the basis of the notarial act executed on December 29, 1984. In short, the State Court ruled that if the State previously acknowledged that it had accepted an otherwise valid donation from petitioner, it was in effect estopped from denying that the donation had occurred. On April 10, 1986, the State appealed the State Court's judgment. On August 20, 1986, petitioner's attorney sent a letter to Governor Edwards and informed him of the dispute over the trophies and requested his assistance. Governor Edwards intervened on petitioner's behalf. Subsequent to this intervention, petitioner agreed to donate the buildings behind his house to the State, and in *575 exchange, the State agreed to drop its appeal. Ram Head Hunting Lodge
On January 25, 1982, petitioner and Ron Hayes, a guide and outfitter in Alaska, purchased the Ram Head Hunting Lodge with the intent to operate it as a hunting lodge. However, they were never able to obtain the proper license necessary to operate the hunting lodge. Consequently, they sold the Ram Head Hunting Lodge in 1985. On Schedule C of their 1983 income tax return, petitioners deducted various expenses under section 162 and depreciated certain recovery property under section 168. On their 1984 and 1985 income tax returns, petitioners claimed depreciation deductions similar to the ones they took in 1983, and they deducted attorneys fees as business expenses. Aside from these expenses, petitioners deducted no other expenses incurred in connection with the Ram Head Hunting Lodge for the years 1984 and 1985. Petitioners reported no gross receipts or sales from the Ram Head Hunting Lodge for any of the years in issue. OPINION 1. Burden of Proof
The first issue for decision is whether the burden of proving that valid donations of the trophies were made to the State is on respondent. Generally, *576 the burden of proof is on the taxpayer. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Respondent bears the burden of proof, however, with "respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer." Rule 142(a). A new theory that is presented to sustain a deficiency is treated as a new matter when it increases the amount of the original deficiency or requires the presentation of different evidence. Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988); Achiro v. Commissioner, 77 T.C. 881, 890 (1981). A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. Achiro v. Commissioner, supra at 890; Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968). In his notice of deficiency, respondent states: The form of making a gift * * * was met, however the substance of actually making a donation * * * has not been verified. There was *577 no verification submitted to indicate that the State of Louisiana (donee) has any plans or funds allocated to maintain this museum or of ever taking actual possession of the mounted animals at any site other than your property. For all practical purposes the trophies given to the State of Louisiana have in substance been returned to you for your control and care. There has been no verification that the State of Louisiana accounts for * * * or evidences any responsibility for the exhibit.
Petitioners argue that the notice of deficiency indicates that respondent did not question the validity of the donation, and that the only issue raised in the notice of deficiency was whether the State had returned the gifts to petitioner. Petitioners further argue that respondent's position that the original donation is not valid is a new theory, and that this new theory rises to the level of a new matter because it requires the presentation of new evidence. The notice of deficiency indicates that respondent is disallowing the charitable contribution deduction because the substance of the donations had not been verified. The notice of deficiency alerted petitioner that he would have to *578 prove that he actually made the donations. Respondent did not assert a new deficiency, raise an affirmative defense, or take a position at trial which was inconsistent with his position in his notice of deficiency or which required the presentation of different evidence. Accordingly, the burden of proof remains with petitioners. 2. Donation of Trophies
The second issue for decision is whether petitioners may claim the deduction for charitable contributions for the donation of trophies petitioner allegedly made to the State during the taxable years 1981 through 1985. Section 170(a) allows a deduction for charitable contributions to any entity described in section 170(c). The State of Louisiana is an entity described in section 170(c). A charitable contribution is made at the time that delivery is effected. Sec. 1.170A-1(b), Income Tax Regs. In determining the existence and timing of a charitable contribution, the analysis applied is the same analysis applied in determining the existence and timing of an inter vivos gift. DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). This Court has consistently *579 held that there are six essential elements to a bona fide inter vivos gift. These six elements are: (1) A donor competent to make a gift; (2) a donee capable of accepting a gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and dominion and control of the entire gift to the donee, such that the donor can exercise no further act of dominion or control over it; (5) delivery by the donor to the donee of the subject matter of the gift or of the most effectual means of commanding dominion over it; and (6) acceptance of the gift by the donee. Guest v. Commissioner, 77 T.C. 9, 15-16 (1981); Weil v. Commissioner, 31 B.T.A. 899, 906 (1934), affd. 82 F.2d 561 (5th Cir. 1936). A. 1981 Through 1984
For the taxable years 1981 through 1984, petitioner fails to establish the final three elements of an inter vivos gift. [8] Petitioner argues that he, acting as the State's agent, effectuated a valid donation by accepting delivery of the *580 gifts on the State's behalf. In effect, petitioner argues that he donated the trophies in his capacity as an individual and accepted the trophies in his capacity as the State's agent. The linchpin of petitioner's position is his purported agency relationship with the State. Under Louisiana law, a donee (in this case the State) may appoint an agent to accept gifts on its behalf. La. Civ. Code Ann. art. 1542 (West 1985). [9] This agency relationship may be created orally, but proof of the agency relationship must comport with the Louisiana statutes regarding conventional obligations. La. Civ. Code Ann. art. 2992 (West 1985); [10]Savoie v. Estate of Rogers, 410 So. 2d 683, 688 (1982). The Louisiana statutes regarding conventional obligations require that petitioner prove the *581 agency relationship with at least one credible witness and other corroborating circumstances. La. Civ. Code Ann. art. 1846 (West 1985); [11]Savoie v. Estate of Rogers, supra.
*582 Petitioner has failed to prove that the agency relationship existed as required by La. Civ. Code Ann. arts. 2992 and 1846. Petitioner never testified that he was appointed to act as the State's agent for purposes of accepting the purported donations. Instead, he only testified that Governor Edwards asked him to store the animals until the State could provide proper facilities for them. Assuming this is what Governor Edwards told petitioner, we are unable to discern from petitioner's testimony any evidence that Governor Edwards specifically designated him to act as the State's agent and accept donations on its behalf. Even if petitioner intended to donate the animals to the State by placing them in the building behind his house, no one acting on the State's behalf accepted the donations, which is a prerequisite for a completed gift. The only other witness called by petitioner to testify on the agency relationship was Governor Edwards. Governor Edwards' testimony does not support petitioner's agency theory. Governor Edwards never testified that he appointed petitioner to act as the State's agent to accept delivery of the donations. Governor Edwards testified that at his meeting *583 with petitioner in 1979, he and petitioner were "lax" in establishing a mechanism for effectuating future "gifts" from petitioner to the State. His explanation of how petitioner's donations were to be accepted by the State after 1979 reflects this. He testified that he accepted the donations on behalf of the State. However, Governor Edwards was not in office from March 1980 until March 1984. We fail to see how he could have accepted gifts on behalf of the State during this period. He also testified that he asked petitioner to place the trophies in the building behind his house and a representative from the State would come by and take a formal inventory. However, no such inventory was taken during these years and, until the execution of the Donation Inter Vivos on December 29, 1984, the State did not have any record of items which petitioner purportedly donated to the State during 1981, 1982, and 1983. In fact, petitioner testified that between March 1980 and March 1984, he could not even get Governor Treen to return his phone calls, much less send someone out to take an inventory. Because petitioner has not presented "one witness and other corroborating circumstances" to *584 prove the agency relationship as required by La. Civ. Code Ann. art. 1846 (West 1985), he has not established the requisite agency relationship upon which his theory of completed donations rests. Accordingly, we hold that petitioners may not claim deductions for petitioner's alleged charitable contributions for the taxable years 1981 through 1984. Petitioners argue on brief that petitioner's position that he is both the donor and the agent of the donee "should not in any way vitiate the agency contract that he had with the State of Louisiana as such a dual capacity is not prohibited under Louisiana law." Although we are unaware of any statute expressly prohibiting the donor from acting as the donee's agent, such an arrangement is inconsistent with requiring a clear and unmistakable manifestation of the intent by the donor to part with legal title, dominion, and control of the subject matter of the gift. In the case where the donee has someone other than himself accept the donation on his behalf, the intent is still evidenced by the transfer of the subject matter of the gift from the donor to a third party, be it the donee or his agent. Louisiana jurisprudence acknowledges this *585 rationale and incorporates it in its decisions. Under Louisiana law, a donation inter vivos by manual gift accompanied by real delivery occurs only when the donor's intent to donate and actual possession of the movable property by the donee operate simultaneously. Adams v. Security Ins. Co. of Hartford, 533 So. 2d 140, 145 (La. Ct. App. 1988), affd. in part and revd. in part 543 So. 2d 480 (1989); Mitchell v. Mitchell, 489 So. 2d 483, 486 (La. Ct. App. 1986); Succession of Broussard, 306 So. 2d 399 (La. Ct. App. 1975). Hand to hand delivery from donor to donee is not required; all that is necessary is a manifestation of intent of the donor to give, accompanied by some form of real delivery. Succession of Young, 563 So. 2d 502, 507 (La. Ct. App. 1990); Succession of McCrocklin, 126 So. 2d 364, 367 (La. Ct. App. 1960), affd. 242 La. 404, 137 So. 2d 274 (1961); Succession of Moran v. Moran, 25 So. 2d 302, 303 (La. Ct. App. 1946); Ory Bros. v. Muller, 14 La. App. 35, 128 So. 903, 905 (La. Ct. App. 1930). In Succession of Zacharie, 119 La. 150, 43 So. 988 (1907), *586 the issue before the Louisiana Supreme Court was whether moneys placed by an agent on behalf of a donor into the donees' bank account was a completed manual gift. The court stated that the bank received the gift as the agent of the donee and that upon receipt, manual delivery was effectuated as the subject matter of the gift was no longer within the dominion and control of the donor. As to the delivery to the donees' agent as a means of completing the gift, the court stated: "He [the donor] wisely placed the funds * * * in a savings bank, and by so doing assured their [the donees'] future against the accidents of a business life and the contingency of his death. This object could only have been accomplished by divesting himself irrevocably of his ownership." Succession of Zacharie, 43 So. at 991. Implicit in the Zacharie decision is the notion that delivery to a third party provides an objective manifestation of the donor's intent to divest himself of ownership of the subject matter of the gift. By contrast, where, as in the instant case, the donor purportedly also acts as the donee's agent, there is no objective manifestation of this intent. *587 The purported transfer and acceptance occur only in the donor's mind. There is no tangible proof of the donation, and the donor is free to retain the "donated" property. In the event of the donor's death, the donee could not establish the gift. In the instant case, the subject matter of the gift never left petitioner's possession. The State never took possession, dominion, or control of the trophies. There was never any objective manifestation of real delivery during the respective years in which the purported gifts were made. Under these circumstances, we find that petitioner has not effectuated a manual gift. We note that there are significant practical problems with petitioner's agency theory. Foremost is the fact that no one from the State appears to have known what was purportedly being donated to the State during the years in which the donations were allegedly made. The legal effect of a completed gift is the transfer of property from the donor to the donee. Surely someone with authority to bind the State would have to know what was being donated and accept it before the gift could be completed. For example, during the years 1981, 1982, and 1983, we do not believe *588 that the State would have accepted any attendant liabilities associated with ownership of the property. It is clear that the State was unable and unwilling to assume even the cost of maintaining and storing the trophies. If, on the other hand, petitioner or his estate had disputed the State's ownership of the property, the State would have had great difficulty proving that it owned the animals. This is because petitioner never made an objective, unequivocal manifestation of his donations which would indicate to third parties his intent to donate. The State possessed no information identifying which property petitioner claims to have donated to the State and no proof of these donations. We also question whether Governor Edwards, just a few months before leaving office, could legally appoint someone to act as the State's agent during the next administration, especially without reducing the appointment to writing or otherwise recording the agency with the State government. Petitioner argues, without citation to any authority, that "obviously, Mr. Miller's agency relationship with the State * * * did not terminate when Governor Edwards left office * * *. Governor Edwards is not *589 the principal in this relationship, the State of Louisiana is." Without further citation to authority, we are unable to grasp the "obviousness" of this position and consider the validity of petitioner's "appointment" an additional problem with petitioner's position. Finally, we address the effect of the State court litigation on the issue of whether a completed gift occurred for purposes of Federal income taxes during the taxable years 1981 through 1984. As the State court decision is not a decision of the highest court in Louisiana, and we are unaware of a ruling by the Louisiana high court on this exact issue, we are only required to give the lower court decision "proper regard." Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 18 L. Ed. 2d 886, 87 S. Ct. 1776 (1967). Our review indicates that the State court did not make an independent finding of fact that petitioner completed the purported gifts in the years claimed on petitioners' tax returns. Instead, the court relied on the Donation Inter Vivos executed by the parties in 1984 to establish the facts upon which summary judgment in favor of petitioner was granted. The Donation Inter Vivos only referred to gifts allegedly made in the *590 years 1979 through 1983. Petitioners argue that the facts stated in the Donation Inter Vivos are sufficient to establish that the donation occurred in the years claimed. However, the State court did not determine that the facts stated in the Donation Inter Vivos actually occurred. Instead, the State court decided that, for purposes of the State court litigation, the State was bound to the recitation of events it agreed to in the Donation Inter Vivos executed on December 29, 1984, regardless of whether these events in fact occurred during the years 1979 through 1983. Thus, the court's judgment was not based on its own independent factual findings. Under these circumstances, we give no weight to the State court's judgment. [12]
*591 Petitioners concede that the 1984 Donation Inter Vivos does not effectuate a gift for any years other than 1979 through 1983. [13] Because of this explicit concession, we do not address whether the Donation Inter Vivos executed on December 29, 1984, resulted in a completed gift in that year. B. 1985
As to the claimed 1985 donation, we find that a valid donation occurred. This donation is not based on petitioner's agency theory. Instead, this *592 donation was effectuated by an Act of Donation Inter Vivos executed on December 30, 1985. Respondent concedes that this document was properly executed. Under Louisiana law, the effect of executing the Act of Donation Inter Vivos is the present and irrevocable divestment of the subject matter of the gift from the donor in favor of the donee, who accepts it. La. Civ. Code Ann. art. 1468 (West 1985). [14] Thus, the fourth and sixth essential elements of a gift are present. We also find that the fifth element, delivery, is present. The regulations do not define delivery. In order to determine whether delivery was effectuated, we look to State law. See Greer v. Commissioner, 70 T.C. 294, 304 (1978), affd. 634 F.2d 1044 (6th Cir. 1980); see also *593 Alioto v. Commissioner, T.C. Memo 1980-360. Louisiana law permits parties to consent to delivery if the property is not transportable. La. Civ. Code Ann. art. 2478 (West 1985). [15] In this case, it appears that removal of the trophies was not practical, and in the notarial act executed on December 30, 1985, the parties consented to delivery. Accordingly, we find that delivery occurred. We also find that petitioner was competent to make the gift, that the State was capable of accepting the gift, and that petitioner intended to divest himself of title, dominion, and control of the subject matter of the gift. Accordingly, we hold that a valid inter vivos gift occurred in 1985 of the items listed on the notarial act executed on December 30, 1985. 3. Valuation of 1985 Trophy *594 Donations
The next issue for decision is the value of the property donated to the State for purposes of the section 170 deduction for charitable contributions. The value of a charitable contribution is purely a factual issue and one that this Court has traditionally admonished the parties for not deciding among themselves. Messing v. Commissioner, 48 T.C. 502, 512 (1967). "The legal standard defining fair market value is 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'" Cupler v. Commissioner, 64 T.C. 946, 955 (1975) (citing Mauldin v. Commissioner, 60 T.C. 749, 758 (1973)); sec. 1.170A-1(c)(1) and (2), Income Tax Regs. The fact that the property is unique and that there is no "market price" is not a barrier to valuation. Cupler v. Commissioner, supra at 955. In determining value, the use to which the donated property will be put is a relevant factor. Guggenheim v. Rasquin, 312 U.S. 254, 258, 85 L. Ed. 813, 61 S. Ct. 507 (1941). In short, valuation *595 issues are questions of fact, and all relevant evidence is to be considered in their resolution. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Cupler v. Commissioner, supra; Mauldin v. Commissioner, supra at 759; Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). Both parties rely heavily on expert opinions to support their contentions as to the value of the contributions. We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness when that opinion is contrary to our judgment, especially where the expert's opinion of value is so exaggerated that the opinion is incredible. Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561. While we may accept the opinion of an expert *596 in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. Consequently, we will take into account expert testimony to the extent it aids us in arriving at the fair market value of the donated property. Respondent relies primarily on the testimony of his expert, Larry C. Blomquist. Mr. Blomquist is a taxidermist who has received national recognition in his field. Mr. Blomquist has never hunted abroad, but he claims that he is aware of the costs of hunting abroad and the expenses of shipping trophies back to the United States because he has many clients who do hunt abroad. Mr. Blomquist has visited museums similar to the one that petitioner wanted to establish and states that through these visits and conversations with individuals connected with these museums, he became familiar with the needs of a museum of this type. Although Mr. Blomquist does not hold himself out as a professional appraiser, he has done appraisals on many occasions. Mr. Blomquist's valuation is based on his finding that, although limited, *597 a market for animal trophies exists. In cases where Mr. Blomquist knew of comparable sales, he valued petitioner's trophies at the sale price. Mr. Blomquist admits that he is unaware of comparable sales for the majority of items in the collection, and he never specifically identified the trophies for which he did find comparables. If there was not a comparable sale, Mr. Blomquist assigned a value based on the sale of a trophy which had a comparable replacement cost. For instance, if there was a trophy for which no comparable sale existed, that trophy received the same value as a trophy which had approximately the same replacement cost and for which there was a comparable sale. Mr. Blomquist testified that by using the term "replacement cost," he meant the cost of obtaining the skin, horns, and other parts domestically, mounting these parts to create a trophy, and adding an additional amount to cover the cost of bringing these elements together. On cross-examination, Mr. Blomquist admitted that it would be difficult to obtain the parts necessary to replace the majority of the trophies in petitioner's collection and that it would be necessary to incur the cost of going into the *598 field in order to replace these trophies. Nevertheless, Mr. Blomquist's report states that he did not include the cost of hunting in his computation of replacement cost because the skins could be obtained from other sources. If the trophy's replacement cost was not the same as a trophy for which Mr. Blomquist had a comparable sale, he would assign a value to the trophy based on his experience and general knowledge of sales of wildlife trophies. Mr. Blomquist considered aspects such as popularity of the species, position and style of mount, availability of the mount, and scarcity of the specimen when determining fair market value. Once Mr. Blomquist established a value for each trophy in the collection, he totaled all of the values and then reduced this total to arrive at a value for the whole collection. Mr. Blomquist reduced the total value because he felt that a volume purchaser would expect a discount and also to reflect the limitations which may be imposed by law on the sale of certain trophies in certain States. [16]
*599 Mr. Blomquist admits that he did not have time to identify several subspecies during his inspection, that he was rushed for time, and that he was forced to identify (and presumably evaluate) some of the trophies based on photographs. Mr. Blomquist also admits that he did not have time to value the trophies as of the day donated, and that instead, he determined the value of the trophies as of December 31, 1988. Finally, Mr. Blomquist admits that he did not increase the value assigned to the trophies which were Safari Club International (SCI) records, even though he admits that this status could increase the value of the trophies from 50 to 500 percent. Petitioner relies primarily on the testimony of Jack B. Perry. [17] Mr. Perry is a taxidermist, president of the World Wildlife Museum, SCI measurer, and an SCI recertification measurer. Mr. Perry has also been employed by respondent to appraise animal collections. Of all the experts who testified at trial, Mr. Perry has the most experience appraising trophies. Mr. Perry examined petitioner's trophies for 4 days in preparation of his evaluation. *600 Mr. Perry began his evaluation by first determining the cost of replacing the trophy. He included the cost of the safari, trophy fees, taxidermy, and shipping in the replacement cost. Mr. Perry recognized that more than one specimen may be taken in a safari and therefore did not include the total cost of a safari in each trophy's replacement cost. Once the replacement cost was established, Mr. Perry adjusted the cost upward to reflect the specimen's rarity, world record class standing artistic value, and current restrictions on hunting the species. With respect to the premium that he attached to a trophy because of its world class status, Mr. Perry testified that a significant element of this factor represented the increased cost of replacing the trophy caused by the fact that it could take several trips to replace a world class trophy. He then totaled the appraisal value assigned to each trophy to arrive at a total value for the entire collection. Respondent argues on brief that Mr. Perry's reliance on replacement costs in his evaluation is improper because a probative correlation between replacement costs and fair market value has not been demonstrated as required by Rev. Proc. 66-49, 1966-2 C.B. 1257, 1258. *601 We find that petitioner has demonstrated a probative correlation between replacement costs and fair market value. As this Court has noted in the past, a correlation between replacement costs and fair market value is generally demonstrated when the property is unusual in nature and other methods of valuation, such as comparable sales or income capitalization, are not applicable due to the property's uniqueness and non-income-producing use. [18] Moreover, the experts agree that a museum could not purchase many of the trophies in petitioner's collection and, instead, would go into the field to collect it. Thus, replacement costs indicate the amount of money that a willing buyer would pay to obtain a trophy. Finally, respondent's own expert admitted that he used replacement value in his evaluation. This also indicates that the probative correlation exists. *602 We find that it is appropriate to consider replacement costs in arriving at fair market value. We do not believe that respondent has shown that the reconstructed "market" created by Mr. Blomquist accurately indicates the price at which petitioner's trophies would sell. However, we do agree with Mr. Blomquist that a purchaser of an entire collection would expect some type of volume discount and that a museum would not pay petitioner full replacement value for a trophy, because for that amount of money, a museum would go into the field and replace the trophy itself. Finally, we find that Mr. Perry's adjustment for world record status is too generous. The testimony of other witnesses for petitioner indicates that, although a museum would display world class mounts, it would not reject other mounts of the same species. Based on the entire record, we find the total value of the trophies contributed to the State in 1985 to be $ 71,000. 4. Limits on Amount of Deduction for Donation of Trophies
The next issue for decision is whether the charitable contribution deductions claimed by petitioners are limited to the fair market value of the animal trophies reduced by the amount *603 of gain which would not have been long-term capital gain if the animal trophies had been sold at their fair market value. See sec. 170(e). On brief, respondent acknowledges that he raised this issue for the first time after trial. Respondent has not sought to amend his answer to include this additional ground for his deficiency determination as required by Rule 41. Therefore, the issue is not properly before us. However, even if respondent had moved to amend his pleadings under Rule 41, it appears that such an amendment would prejudice petitioner, who did not have an opportunity to present evidence on this issue at trial. Under these circumstances, we would be inclined to deny such a motion. See Law v. Commissioner, 84 T.C. 985, 991 (1985). Finally, if the issue was properly before us, respondent would bear the burden of proof as this issue constitutes a new matter. [19] Rule 142(a). Respondent is unable to satisfy his burden of proof. He failed to present any evidence on petitioner's basis in the trophies. Moreover, we value petitioner's trophies at a value which is less than the replacement costs which Jack Perry determined. [20] This indicates that *604 petitioner's cost basis in the trophies may have exceeded their fair market value. In that case, the exclusion of built-in ordinary income from the deduction for charitable contributions does not apply. Accordingly, we hold for petitioner on this issue. 5. Hunting and Mounting Expenses
The next issue for decision is whether petitioners can deduct the "cash contributions" that they allegedly made to the State. The cash contributions represent payment of expenses which petitioner allegedly incurred while hunting and mounting the trophies that he claims he contributed to the State. Section 1.170A-1(g), Income Tax Regs., provides in part: "unreimbursed expenditures made incident to the rendition of services to an organization contributions to *605 which are deductible may constitute a deductible contribution." There is no argument that petitioner was not reimbursed for his alleged expenses and that payment of expenses incident to rendering services to the State would constitute a deductible contribution. The parties disagree on whether petitioner was rendering services to the State when he incurred the expenses. Petitioner argues that, pursuant to his commission as the Official Big Game Hunter for the State, he was required to travel the world and obtain trophies to be placed in the State's wildlife museum. In executing his commission, petitioner incurred expenses for which he was not reimbursed. These expenses form the basis for petitioners' claimed deduction for the "cash contributions." Respondent argues that the expenses incurred by petitioner on his hunting trips were not incident to the rendition of services to the State as required by section 1.170A-1(g), Income Tax Regs. Instead, respondent argues that these expenses were incurred while petitioner was on personal trips during which he acquired personal property. Respondent further argues that petitioner was designated as the Official Big Game Hunter for the State *606 in order to assist him in obtaining access to certain hunting areas and that the designation did not create an agency relationship under which the trophies taken became the State's property. We agree with respondent. Petitioner testified that the trophies he acquired were his own personal property, and that he was under no legal obligation to donate them to the State. If petitioner were on the hunting trips as the State's agent, then the property he acquired would belong to the State. This is because, under agency law, the benefits derived from the agent's efforts inure to the principal. La Civ. Code Ann. art. 3005 (West 1985); [21]Neal v. Daniels, 217 La. 679, 47 So. 2d 44, 45 (1950); Restatement, Agency 2d, sec. 388 (1957). Petitioner considered the trophies to be his property. The trips to acquire them were also personal to petitioner and not incident to the rendition of services for the State. Thus, the expenses are not deductible. *607 Moreover, if we permitted petitioners to deduct both the expenses for the "cash contributions" and the fair market value of the property that petitioner contributed to the State, we would in effect permit petitioners to take a double deduction. Petitioners could first deduct their acquisition cost, and then they could deduct the fair market value of the property computed on the basis of replacement costs. Not only is this illogical, it is not permitted under the regulations, which require that a taxpayer incur the expenses incident to the rendition of services to the State. If the services are rendered on behalf of the State, then the property is the State's property, and petitioner could not subsequently contribute the property and claim a deduction. If petitioner acquires the property on his own behalf, then he is not rendering services to the State and, therefore, may not deduct the expenses incurred in connection with the acquisition. Petitioners cite Cupler v. Commissioner, 64 T.C. 946 (1975); LaGarde v. United States, 1975 U.S. Dist. LEXIS 14883, 37 A.F.T.R.2d (RIA) 556, 76-1 U.S. Tax Cas. (CCH) P9248 (N.D. Ala. 1975); and Jersig v. United States, 1968 U.S. Dist. LEXIS 11806, 27 A.F.T.R.2d (RIA) 1102, 69-1 U.S. Tax Cas. (CCH) P9311 (W.D. Tex. 1969), *608 for the proposition that they may deduct both the expense of acquiring the trophies and the fair market value of the trophies. Petitioners' reliance on these cases is misplaced. None of these cases establish whether the taxpayers obtained the property on behalf of the charitable organization or for themselves. Because this factual issue is not established, these cases are distinguishable. [22]
6. Expenses for Maintenance of Trophies
The next issue for decision is whether petitioners may deduct expenses incurred in connection with *609 the care and maintenance of the trophies that petitioner donated to the State. Since we find that petitioner did not donate the trophies that he claims he donated in the years 1981 through 1984, the expenses incurred in connection with the care and maintenance of these trophies are nondeductible personal expenses. Because we find that petitioner donated trophies in 1985, we will consider whether the expenses incurred in connection with the care and maintenance of these trophies are deductible. At trial, the only evidence petitioner presented on this issue was his own testimony. Petitioner presented no other evidence to substantiate his claim that he incurred the expenses he deducted. We find that petitioner has failed to satisfy his burden of proving that he actually incurred the expenses which he deducted. Accordingly, we hold for respondent on this issue. [23]
*610 7. Addition to Tax for Overvaluation
The next issue for decision is whether petitioners are liable for additions to tax for valuation overstatements of property under section 6659 for the taxable years 1981, 1983, and 1984. [24] Section 6659 imposes a graduated addition to tax on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Sec. 6659(d). A valuation overstatement exists if "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c)(1). Where a determination that a taxpayer is not entitled to the claimed deductions is upheld without regard to any claim of basis or without findings with respect to fair market value, the addition to tax under section 6659 may be *611 inapplicable because the resulting underpayment of tax may be attributable solely to the disallowed deductions, not to a valuation overstatement. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); McCrary v. Commissioner, 92 T.C. 827, 851-855 (1989); Suna v. Commissioner, T.C. Memo 1988-541, affd. 893 F.2d 133 (6th Cir. 1990). In this case, the deductions for charitable contributions for the years 1981, 1983, and 1984 were disallowed because the contributions were not completed. However, we made no findings of fact as to the correct value of the trophies that petitioner purportedly donated to the State during these years. Thus, the valuation overstatements, if any, regarding the trophies were not integral to, and inseparable from, our disallowance of the deductions for the charitable contributions. The underpayments, therefore, were not "attributable to" valuation overstatements. Under these circumstances, the additions to tax under section 6659 are not applicable. Todd v. Commissioner, supra.Accordingly, we hold for petitioners on *612 this issue. 8. Deduction Related to Hunting Lodge
The final issue for decision is whether petitioners are entitled to business expenses and depreciation deductions for the taxable years 1983 through 1985 for expenses allegedly incurred in connection with the operation of the Ram Head Hunting Lodge. Petitioners deducted business expenses under section 162 on Schedule C of their 1983, 1984, and 1985 income tax returns. In order to deduct expenses under section 162, the expenses must be paid or incurred in connection with an active trade or business. Thus, petitioners must demonstrate that they actively engaged in the trade or business of operating a hunting lodge. Rule 142(a). Petitioners argue that the expenses "were directly related to the operation of the business." Respondent, on the other hand, argues that the expenses are not deductible because the Ram Head Hunting Lodge was not operated as a trade or business. We find that petitioners were not engaged in an active trade or business. The record clearly indicates that petitioner never obtained the license necessary to operate the hunting lodge. The record also indicates that no revenues were ever generated by this *613 activity. Petitioner acknowledges that he could not operate the hunting lodge business without the license, and that he was unable to obtain that license. Under these circumstances, we do not believe it was possible for petitioners to have engaged in a trade or business as required by section 162. The expenses which petitioners purportedly incurred are at best preoperating expenses. These expenses are clearly not deductible. Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410, 411 (4th Cir. 1965), overruled on other grounds NCNB v. United States, 684 F.2d 285, 289 (4th Cir. 1982); Hardy v. Commissioner, 93 T.C. 684 (1989); Bennett Paper Corp. v. Commissioner, 78 T.C. 458 (1982), affd. 699 F.2d 450 (8th Cir. 1983). The instant case is analogous to Richmond Television Corp. v. United States, supra.In Richmond Television Corp., the taxpayer incurred expenses in connection with training its *614 employees prior to obtaining a broadcast license from the Federal Communications Commission (FCC). The taxpayer deducted these expenses in the year incurred and prior to obtaining the FCC license or broadcasting television signals. The Fourth Circuit held that the expenses were incurred before the taxpayer obtained the proper licensing to engage in the business of television broadcasting. Therefore, the expenses were preoperating expenses and not deductible under section 162 as that section requires that the taxpayer actively engage in the trade or business in order to deduct expenses. In the instant case, petitioner lacked the proper licensing to engage in the trade or business of operating a hunting lodge. As a result of his inability to obtain this license, he abandoned his pursuit of this activity. Because petitioner never engaged in the trade or business of operating a hunting lodge, expenses incurred in connection with the Ram Head Hunting Lodge are not deductible under section 162. Petitioners also claimed depreciation deductions under section 168. Section 168(c) allows for accelerated cost recovery of property which is "of a character subject to the allowance for depreciation." *615 Sec. 168(c). Thus, section 168(c) imposes the same limitations on deductions as section 167. In order to depreciate property under section 167, the property must be used in a trade or business or held for the production of income within the meaning of section 167(a). Porreca v. Commissioner, 86 T.C. 821, 843 (1986); Flowers v. Commissioner, 80 T.C. 914, 931-932 (1983). The trade or business and production of income requirements under section 167 are the same as those under sections 162 and 212. Lemmen v. Commissioner, 77 T.C. 1326, 1340 n.16 (1981). Because section 168 recovery property must be of the same character as depreciable property under section 167, the property must meet either the trade or business or production of income requirements of either section 162 or section 212. We have already held that petitioners were not engaged in a trade or business for purposes of section 162. Accordingly, the property they depreciated in connection with the same activity does not satisfy the trade or business requirement of section 162 for purposes of section 168. As to the held-for-production-of-income requirement under *616 section 212, this Court has held that the preoperating expense doctrine applies to deductions claimed under section 212 and that section 212 requires that the taxpayer actually enter into the income-producing activity in order for the property to be considered held for the production of income. Hardy v. Commissioner, supra at 693. As with the costs of starting up a new trade or business, the cost of starting up a new income-producing activity is inherently capital as such expenses are incurred in creating or acquiring a capital asset. Hardy v. Commissioner, supra at 690. Capital expenses are not deductible under section 212. Sec. 1.212-1(n), Income Tax Regs. Because petitioners failed to prove that they satisfied the trade or business requirement of either section 162 or the held-for production-of-income requirement of section 212, we hold for respondent on this issue. Decision will be entered under Rule 155. APPENDIX Tax Year 1981
Appraisal Report
Appraised Value
Brian Gaisfordc
Jack Perry
SPANISH IBEX
$ 5,000
$ 4,500
SIBERIAN IBEX
6,500
17,500
SIBERIAN IBEX
6,000
6,000
SPANISH IBEX
14,000
27,000
ARGALI GOBI
11,000
25,000
MOUFLON SHEEP
6,000
16,000
TUR
9,500
17,500
MOUNTAIN LION
4,500
4,500
ALASKAN BROWN BEAR
7,500
*
ASIATIC FOUR HORNED SHEEP
3,500
3,500
WILD TURKEY
1,000
1,000
SPANISH GOAT
3,000
3,500
OPOSSUM VIRGINIA
750
500
RACOON
900
500
MONGOLIAN WILD CAT
1,200
6,000
WATER BUFFALO
3,500
5,500
DALL SHEEP
25,000
25,000
DALL SHEEP
**
12,500
ARMENIAN SHEEP
3,500
15,000
STONE SHEEP
9,000
9,000
URIAL RAM
12,000
35,000
MOUNTAIN GOAT
4,500
5,000
DESERT SHEEP
12,000
20,000
BARBARY SHEEP
6,500
8,500
ASIAN BUFFALO
4,500
6,500
SIBERIAN IBEX
4,500
6,000
MARAL STAG
4,500
4,500
ELK
3,500
*
MOUFLON SHEEP
4,500
5,500
CORSICAN SHEEP
3,000
3,500
BLACK BEAR
4,500
4,500
ARGALI ALTAI
50,000
45,000
ARGALI ALTAI
50,000
45,000
FALLOW DEER
3,000
4,500
*617 Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
FALLOW DEER
4,000
4,500
BLACK BEAR
5,000
5,000
JAVELINA OR PECCARY: (3)
Male
2,500
2,500
Female
2,200
2,500
Piglet
1,500
1,500
FOX SQUIRREL
350
250
GREY DUCK
950
500
WOOD DUCK
950
500
WHITE-TAILED DEER: (3)
Female
3,500
3,500
Fawn
1,500
1,500
Base
1,200
1,200
HAWK
800
350
WARTHOG
1,200
3,500
WARTHOG
1,200
3,500
ELAND-GIANT
8,500
7,250
HARTEBEEST LICHTENSTEIN
4,500
4,250
BUFFALO CAPE
5,000
5,500
WILDEBEEST-GNU
4,500
5,500
ARTIC FOX
1,600
1,200
ARTIC FOX
1,600
1,200
WALRUS: (2)
7,000
7,000
WOLF BLACK
4,000
4,000
FOX RED MONGOLIAN
1,700
2,500
ARTIC FOX
1,600
1,200
ARTIC HARE
900
500
MOUNTAIN CARIBOU
8,000
8,000
MUSXOX: (3)
Male
11,000
20,000
Female
9,000
15,000
Calf
6,000
15,000
WOLF ARTIC
4,500
4,500
POLAR BEAR
18,000
25,000
FOX
1,500
1,200
EMPERIOR GOOSE
1,000
500
PTARMIGAN: (2)
800
250 ea.
MARTEN FISHER
1,100
1,100
FOX CROSS PHASE
1,600
1,200
FOX ARTIC BLUE PHASE
1,600
1,200
ARTIC HARE
1,200
400
SNOWY OWL
2,000
2,000
WOLF
4,500
*
OTTER
1,200
1,200
BEAVER
3,600
3,600
NILGAI
8,000
18,000
NYALA
5,500
6,000
NYALA
4,000
6,000
ZEBRA COMMON
7,500
7,500
SASSABY
6,000
8,500
BLESBOK
5,000
55,000
RED FOX
1,600
750
WILD TURKEY
1,100
1,000
ORIBI: (2)
Male
3,500
7,400
Female
3,000
7,500
BUSHBUCK: (2)
Male
5,500
10,000
Female
4,500
5,500
SPRINGBUCK
3,000
4,750
HARTEBEEST RED
6,500
6,500
LLAMA
3,500
3,500
COKES HARTEBEEST
6,500
20,500
ORYX OR GEMSBOK
7,500
7,500
REED BUCK
4,000
55,000
ERITREAN GAZELLE
4,000
20,000
JAVELINA OR PECCARY: (3)
6,200
5,000
*618 Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
ROAN ANTELOPE
10,000
17,000
ZEBRA
9,500
9,500
JAGUAR
8,500
9,000
ELEPHANT
60,000
60,000
GIRAFFE RETICULATED
40,000
27,000
SABLE ANTELOPE
9,000
9,000
IMPALA RAM
4,500
5,750
IMPALA RAM
4,500
5,750
WHITE-TAILED GAZELLE
4,500
40,000
GIVENUTS (2)
1,200
600 ea.
WHITE EARED KOB
5,500
12,000
WILDEBEEST
6,500
9,500
ORYX SCIMITAR HORNED
10,000
10,000
WATERBUCK
6,500
6,500
WARTHOG
4,500
12,000
WATERBUCK
*
*
KUDU
7,000
11,500
KUDU
5,000
7,500
RED LECHWE
8,000
8,500
TIANG
5,500
6,500
LESSER KUDU
5,000
7,500
YELLOW BACKED DUIKER
4,000
40,000
NILE LECHWE
9,500
9,500
BUSH PIG
4,000
4,000
COLOBUS MONKEY
7,500
7,500
MONGALLA GAZELLE
4,000
8,500
MONGALLA GAZELLE
4,000
25,000
TAHR-HIMALAYAN
5,000
5,500
BLACK TAILED GAZELLE
4,500
6,000
BLACK TAILED GAZELLE
4,500
6,000
DUIKER
4,000
9,500
DIK-DIK
3,000
55,000
DIK-DIK
2,500
5,500
STEINBOK
3,000
6,250
PUDU DEER
3,500
15,500
MUNTJAC
4,500
17,500
HYENA-SPOTTED
3,500
4,500
SPRINGBUCK
4,000
10,000
WHITE EARED KOB
7,500
25,000
LEOPARD
8,500
9,500
BABOON
3,000
4,500
BLACK BUCK
4,500
4,500
ADDAX
11,000
20,000
DAMA GAZELLE
6,000
17,000
OSTRICH
4,000
5,500
LION
14,000
14,000
LION
14,000
14,000
PHEASANTS: (4)
2,500
500 ea.
JACKAL
2,500
2,500
RED LEGGED CHUCKERS: (2)
1,200
600 ea.
GRANTS GAZELLE
4,500
6,500
DINKA TRIBE SPEARS: (2)
400
*
DINKA TRIBE ARROWS: (6)
150
*
SEAL SKIN GLOVES
550
*
WOLF SKIN GLOVES
550
*
AZANDE KNIVES
750
*
OULU SKINNERS KNIFE
100
*
ESKIMO HAND WOVEN CALENDAR
500
*
MONGOLIAN TRIBAL BOOTS
1,100
*
SEAL SKIN COAT
15,000
*
SEAL SKIN BOOTS
450
*
RED SHEEP
7,500
15,000
NUBIAN IBEX
7,500
12,500
BOBCAT: (3)
4,500
1,000 ea.
CORSICAN RAM
6,000
4,000
TAHR HIMALAYAN
6,000
6,000
ERITREAN GAZELLE
4,000
5,500
GRIZZLY BEAR
8,500
10,000
QUEBEC-LABRADOR CARIBOU
8,000
8,000
SIKA DEER
3,500
3,500
SIKA DEER
4,000
3,500
MULE DEER
5,500
5,500
MARAL STAG (Elk)
7,500
7,500
AMERICAN ELK
7,000
7,000
ELK
6,000
6,000
ELK
3,500
3,500
COYOTE
1,800
1,500
FOX SQUIRREL
300
300
SPRINGBUCK
4,000
8,500
RED LION OR MOUNTAIN LION
6,500
7,500
WHITE-TAILED GAZELLE
4,500
55,000
AXIS DEER
4,500
4,500
AXIS DEER
4,000
4,000
BISON
11,000
9,600
BROWN BEAR
9,000
13,000
RED DEER
5,500
5,500
RED DEER
4,500
4,500
RED DEER
4,000
4,000
MOOSE
60,000
60,000
CARIBOU-MOUNTAIN
8,000
8,000
CARIBOU-QUEBEC
5,000
4,500
CARIBOU-BARREN GROUND
5,500
*
MOOSE
5,500
**
Total:
$ 1,154,650
$ 1,749,250
*619 Replacement Value
Value Assigned
Jack Perry
Larry Blomquistc
SPANISH IBEX
$ 4,500
$ 5,333
SIBERIAN IBEX
6,000
6,000
SIBERIAN IBEX
6,000
6,000
SPANISH IBEX
5,500
5,333
ARGALI GOBI
12,500
10,000
MOUFLON SHEEP
5,500
5,000
TUR
12,000
5,500
MOUNTAIN LION
4,500
3,500
ALASKAN BROWN BEAR
*
*
ASIATIC FOUR HORNED SHEEP
3,500
3,500
WILD TURKEY
1,000
500
SPANISH GOAT
3,500
2,400
OPOSSUM VIRGINIA
500
200
RACOON
500
350
MONGOLIAN WILD CAT
6,000
2,000
WATER BUFFALO
5,500
*
DALL SHEEP
25,000
10,000
DALL SHEEP
12,500
**
ARMENIAN SHEEP
15,000
4,500
STONE SHEEP
9,000
4,665
URIAL RAM
15,000
6,000
MOUNTAIN GOAT
5,000
4,000
DESERT SHEEP
20,000
16,500
BARBARY SHEEP
8,500
3,500
ASIAN BUFFALO
5,500
*
SIBERIAN IBEX
6,000
1,000
MARAL STAG
4,500
*
ELK
*
*
MOUFLON SHEEP
5,500
5,000
CORSICAN SHEEP
3,500
2,500
BLACK BEAR
4,500
3,700
ARGALI ALTAI
35,000
10,000
ARGALI ALTAI
35,000
10,000
FALLOW DEER
4,500
2,600
FALLOW DEER
4,500
*
BLACK BEAR
5,000
1,200
JAVELINA OR PECCARY: (3)
1,800
Male
2,500
**
Female
2,500
**
Piglet
1,500
**
Replacement Value
Value Assigned
Jack Perry
Larry Blomquistc
FOX SQUIRREL
250
100
GREY DUCK
500
343
WOOD DUCK
500
343
WHITE-TAILED DEER: (3)
Female
3,500
1,800
Fawn
1,500
700
Base
1,200
*
HAWK
350
343
WARTHOG
3,500
800
WARTHOG
3,500
800
ELAND-GIANT
7,250
1,500
HARTEBEEST LICHTENSTEIN
4,250
800
BUFFALO CAPE
5,500
1,500
WILDEBEEST-GNU
5,500
850
ARTIC FOX
1,200
900
ARTIC FOX
1,200
850
WALRUS: (2)
7,000
*
WOLF BLACK
4,000
2,350
FOX RED MONGOLIAN
2,500
1,000
ARTIC FOX
1,200
900
ARTIC HARE
500
300
MOUNTAIN CARIBOU
6,500
5,200
MUSXOX: (3)
17,000
Male
15,000
**
Female
15,000
**
Calf
15,000
**
WOLF ARTIC
4,500
2,350
POLAR BEAR
25,000
20,000
FOX
1,200
850
EMPERIOR GOOSE
500
343
PTARMIGAN: (2)
250 ea.
343
MARTEN FISHER
1,100
200
FOX CROSS PHASE
1,200
750
FOX ARTIC BLUE PHASE
1,200
950
ARTIC HARE
400
300
SNOWY OWL
2,000
400
WOLF
*
2,350
OTTER
1,200
450
BEAVER
3,600
840
NILGAI
8,000
7,500
NYALA
6,000
4,000
NYALA
6,000
*
ZEBRA COMMON
7,500
6,000
SASSABY
6,500
4,000
BLESBOK
55,000
3,500
RED FOX
750
300
WILD TURKEY
1,000
350
ORIBI: (2)
3,000
Male
4,000
**
Female
4,000
**
BUSHBUCK: (2)
5,500
Male
4,500
**
Female
5,500
**
SPRINGBUCK
4,750
3,000
HARTEBEEST RED
6,500
4,000
LLAMA
3,500
3,000
COKES HARTEBEEST
6,500
4,000
ORYX OR GEMSBOK
7,500
4,000
REED BUCK
55,000
3,500
ERITREAN GAZELLE
5,500
3,367
JAVELINA OR PECCARY: (3)
5,000
2,400
ROAN ANTELOPE
8,500
6,500
ZEBRA
9,500
6,000
JAGUAR
9,000
8,000
ELEPHANT
60,000
40,000
GIRAFFE RETICULATED
27,000
25,000
SABLE ANTELOPE
9,000
6,000
IMPALA RAM
4,500
2,500
IMPALA RAM
4,500
2,500
WHITE-TAILED GAZELLE
6,000
3,367
GIVENUTS (2)
600 ea.
1,200
WHITE EARED KOB
5,500
4,500
WILDEBEEST
6,500
4,000
ORYX SCIMITAR HORNED
10,000
7,500
WATERBUCK
6,500
4,500
WARTHOG
5,500
5,000
WATERBUCK
*
4,500
KUDU
7,500
5,000
KUDU
7,500
4,000
RED LECHWE
7,500
4,500
TIANG
6,500
4,000
LESSER KUDU
7,500
3,500
YELLOW BACKED DUIKER
5,000
1,788
NILE LECHWE
9,500
6,500
BUSH PIG
4,000
3,000
COLOBUS MONKEY
7,500
7,500
MONGALLA GAZELLE
4,500
3,367
MONGALLA GAZELLE
4,500
3,367
TAHR-HIMALAYAN
5,500
3,500
BLACK TAILED GAZELLE
6,000
3,367
BLACK TAILED GAZELLE
6,000
3,367
DUIKER
4,500
1,750
DIK-DIK
55,000
2,500
DIK-DIK
4,250
*
STEINBOK
4,250
1,500
*620 Replacement Value
Value Assigned
Jack Perry
Larry Blomquistc
PUDU DEER
15,500
2,500
MUNTJAC
6,500
3,000
HYENA-SPOTTED
4,500
2,000
SPRINGBUCK
4,500
3,000
WHITE EARED KOB
7,500
4,800
LEOPARD
9,500
10,000
BABOON
4,500
2,500
BLACK BUCK
4,500
2,000
ADDAX
11,000
4,800
DAMA GAZELLE
6,500
3,367
OSTRICH
5,500
4,000
LION
14,000
10,000
LION
14,000
10,000
PHEASANTS: (4)
500 ea.
325
JACKAL
2,500
800
RED LEGGED CHUCKERS: (2)
600 ea.
343
GRANTS GAZELLE
5,500
3,367
DINKA TRIBE SPEARS: (2)
*
*
DINKA TRIBE ARROWS: (6)
*
*
SEAL SKIN GLOVES
*
*
WOLF SKIN GLOVES
*
*
AZANDE KNIVES
*
*
OULU SKINNERS KNIFE
*
*
ESKIMO HAND WOVEN CALENDAR
*
*
MONGOLIAN TRIBAL BOOTS
*
*
SEAL SKIN COAT
*
*
SEAL SKIN BOOTS
*
*
RED SHEEP
15,000
4,000
NUBIAN IBEX
7,500
*
BOBCAT: (3)
1,000 ea.
2,500
CORSICAN RAM
4,000
2,200
TAHR HIMALAYAN
6,000
5,000
ERITREAN GAZELLE
5,500
3,367
GRIZZLY BEAR
10,000
7,500
QUEBEC-LABRADOR CARIBOU
8,000
5,200
SIKA DEER
3,500
2,000
SIKA DEER
3,500
2,000
MULE DEER
5,500
3,000
MARAL STAG (Elk)
7,500
6,000
AMERICAN ELK
7,000
5,000
ELK
6,000
6,000
ELK
3,500
5,000
COYOTE
1,500
900
FOX SQUIRREL
300
100
SPRINGBUCK
5,500
3,000
RED LION OR MOUNTAIN LION
7,500
1,500
WHITE-TAILED GAZELLE
55,000
3,367
AXIS DEER
4,500
2,500
AXIS DEER
4,000
1,500
BISON
9,600
5,800
BROWN BEAR
13,000
7,500
RED DEER
5,500
6,300
RED DEER
4,500
*
RED DEER
4,000
*
MOOSE
60,000
15,000
CARIBOU-MOUNTAIN
8,000
5,200
CARIBOU-QUEBEC
4,500
5,200
CARIBOU-BARREN GROUND
*
5,200
MOOSE
*
7,000
Total:
$ 1,391,100
$ 661,712
*621 Tax Year 1982
Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
LEOPARD
$ 5,000
$ 9,000
DESERT BIG HORN
4,000
20,000
DESERT BIG HORN
4,000
25,000
DESERT BIG HORN
3,500
17,000
OSTRICH (4 chicks)
450
450
PYTHON
1,200
2,600
RAINBOW TROUT
350
*
RAINBOW TROUT
300
*
IBEX NUBIAN
4,000
7,500
BARREN GROUND CARIBOU
6,000
18,000
COUGAR AND MULE DEER
(Mounted Together)
6,000
9,300
BARASINGHA
2,000
3,300
BONGO
8,000
40,000
SITATUNGA
3,500
27,000
ORYX BEISA
2,500
6,500
DOMESTIC COW (DINKA TRIBE)
2,000
5,500
Total:
$ 52,800
$ 191,150
Replacement Value
Value Assigned
Jack Perry
Larry Blomquist
LEOPARD
$ 9,000
$ 10,000
DESERT BIG HORN
17,000
18,000
DESERT BIG HORN
17,000
18,000
DESERT BIG HORN
17,000
18,000
OSTRICH (4 chicks)
450
800
PYTHON
2,600
3,000
RAINBOW TROUT
*
*
RAINBOW TROUT
*
*
IBEX NUBIAN
7,500
4,000
BARREN GROUND CARIBOU
12,800
5,200
COUGAR AND MULE DEER
(Mounted Together)
9,300
7,000
BARASINGHA
3,300
5,000
BONGO
32,000
5,500
SITATUNGA
7,000
5,500
ORYX BEISA
6,500
4,000
DOMESTIC COW (DINKA TRIBE)
5,500
4,500
Total:
$ 146,950
$ 108,500
*622 Tax Year 1983
Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
ELEPHANT TUSKS: (2)
$ 23,000
$ 28,400
HARTEBEEST LELWEL
3,500
9,500
HARTEBEEST LICHTENSTEIN
3,500
8,000
GRYSBOK: (2)
3,400
6,000
PYTHON
1,200
*
WILD DOG
1,800
4,500
SITATUNGA
3,500
8,500
WHITE-TAILED DEER
2,500
3,500
JAGUAR
5,000
9,000
PRONGHORN ANTELOPE
2,000
3,500
RED DUIKER
2,000
5,600
BLACK LECHWE
5,500
20,000
BUSHBABY: (2)
1,200
1,200
NARWHAL TUSK
6,000
6,000
VERVET MONKEY
450
1,500
VERVET MONKEY
450
1,500
MONGOOSE
400
400
LARGE SPOTTED GENET
600
750
SERVEL CAT
1,200
2,500
SILVER BACKED JACKAL
1,000
2,500
CIVET
800
2,500
MONITOR LIZARD
1,000
1,000
BROWN BEAR: (2)
18,000
26,000
DALL SHEEP
25,000
**
BLACK COYOTE
1,800
1,800
MARABOU STORK
900
900
HAMMERHEAD: (2)
800
800
SPOONBILL
400
400
GOLDEN EAGLE
1,200
4,000
GOLDEN EAGLE
1,200
4,000
BROWN HARRIER EAGLE
1,500
1,500
BROWN HARRIER EAGLE
1,500
1,500
RED-BILLED HORNBILL
900
900
AFRICAN GROUND HORNBILL
750
750
SACRED IBIS
900
900
LILAC ROBBERS: (3)
750
750
SPURWING GOOSE
750
750
SPURWING GOOSE
800
800
EGYPTIAN GOOSE
750
700
EGYPTIAN GOOSE
700
700
EGYPTIAN GOOSE
700
700
BROWN EARED PHEASANT
600
600
ELLIOT'S PHEASANT
1,800
1,800
TOPKNOP DOVE
300
300
GREATER BUSHBABY OR GALAGO
1,200
1,200
TARUCO
450
450
BLACK VULTURE
900
900
Total:
$ 134,550
$ 179,450
*623 Replacement Value
Value Assigned
Jack Perry
Larry Blomquist
ELEPHANT TUSKS: (2)
$ 28,400
$ 9,000
HARTEBEEST LELWEL
7,000
4,000
HARTEBEEST LICHTENSTEIN
7,000
4,000
GRYSBOK: (2)
6,000
6,000
PYTHON
*
**
WILD DOG
4,500
1,500
SITATUNGA
7,000
5,500
WHITE-TAILED DEER
3,500
2,900
JAGUAR
9,000
8,000
PRONGHORN ANTELOPE
3,500
2,500
RED DUIKER
5,600
1,788
BLACK LECHWE
7,200
4,500
BUSHBABY: (2)
1,200
**
NARWHAL TUSK
6,000
*
VERVET MONKEY
1,500
500
VERVET MONKEY
1,500
500
MONGOOSE
400
350
LARGE SPOTTED GENET
750
1,500
SERVEL CAT
2,500
1,000
SILVER BACKED JACKAL
2,500
800
CIVET
2,500
1,200
MONITOR LIZARD
1,000
200
BROWN BEAR:(2)
26,000
20,000
DALL SHEEP
*
*
BLACK COYOTE
1,800
750
MARABOU STORK
900
343
HAMMERHEAD: (2)
800
*
SPOONBILL
400
343
GOLDEN EAGLE
4,000
2,000
GOLDEN EAGLE
4,000
2,000
BROWN HARRIER EAGLE
1,500
1,486
BROWN HARRIER EAGLE
1,500
1,486
RED-BILLED HORNBILL
900
500
AFRICAN GROUND HORNBILL
750
500
SACRED IBIS
900
343
LILAC ROBBERS: (3)
750
*
SPURWING GOOSE
750
343
SPURWING GOOSE
800
**
EGYPTIAN GOOSE
700
343
EGYPTIAN GOOSE
700
343
EGYPTIAN GOOSE
700
343
BROWN EARED PHEASANT
600
343
ELLIOT'S PHEASANT
1,800
343
TOPKNOP DOVE
300
343
GREATER BUSHBABY OR GALAGO
1,200
*
TARUCO
450
*
BLACK VULTURE
900
343
Total:
$ 161,650
$ 88,233
*624 Tax Year 1984
Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
ORIBI
$ 800
$ 2,850
WILDEBEEST COOKSAN
4,000
8,500
BLACK COBRA
600
600
BLUE DUIKER
1,750
14,000
PUKU
3,500
15,000
LORD DERBY ELAND
5,000
25,000
LECHWE KAFUE
3,000
8,000
SABLE ANTELOPE
5,000
20,000
SERVAL CAT
1,000
2,500
BUSHBUCK HARNESSES
2,000
7,500
ZEBRA
3,500
7,500
KLIPSPRINGER
750
3,750
PETERS DUIKER
1,750
30,000
PETERS DUIKER
1,750
5,600
LEOPARD
4,000
9,000
LIVINGSTONS ELAND
4,500
9,500
ELK
4,500
*
CARIBOU BARREN GROUND
4,500
*
REEDBUCK BOHAR NIGERIAN
3,000
40,000
WOLVERINE
1,200
1,500
OTTER
800
800
OTTER
800
800
COYOTE
1,200
1,200
FRANCOLIN
450
450
CROWNED CRANE
800
800
CROWNED CRANE
800
800
CROWNED CRANE
800
800
DUCK ZAMBIA
400
400
MARABOU STORK
800
800
RED FISH
250
*
Total:
$ 63,200
$ 217,650
Replacement Value
Value Assigned
Jack Perry
Larry Blomquist
ORIBI
$ 2,850
No Report
WILDEBEEST COOKSAN
6,000
BLACK COBRA
600
BLUE DUIKER
5,000
PUKU
6,000
LORD DERBY ELAND
14,000
LECHWE KAFUE
5,900
SABLE ANTELOPE
8,000
SERVAL CAT
2,500
BUSHBUCK HARNESSES
5,500
ZEBRA
7,500
KLIPSPRINGER
3,750
PETERS DUIKER
5,600
PETERS DUIKER
5,600
LEOPARD
9,000
LIVINGSTONS ELAND
9,500
ELK
*
CARIBOU BARREN GROUND
*
REEDBUCK BOHAR NIGERIAN
5,700
WOLVERINE
1,500
OTTER
800
OTTER
800
COYOTE
1,200
FRANCOLIN
450
CROWNED CRANE
800
CROWNED CRANE
800
CROWNED CRANE
800
DUCK ZAMBIA
400
MARABOU STORK
800
RED FISH
*
Total:
$ 111,350
*625 Tax Year 1985
Appraisal Report
Appraised Value
Brian Gaisford
Jack Perry
ATLANTIC PUFFIN
$ 750
$ 750
BLACK DUCK
300
300
BLACK LEOPARD
5,000
9,000
COYOTE (Cub)
500
500
DORCAS GAZELLE
1,800
19,000
EIDER-COMMON
250
250
EIDER KING
250
250
GUGUINEFOWL
175
175
HARLEQUIN DUCK
250
250
HARTEBEEST SENEGAL
3,000
18,000
LION
5,500
12,000
LORD DERBY ELAND
7,000
16,000
MOOSE SHIRAS
5,500
9,000
MURRE DUCK
250
250
NUTRIA
300
300
OLD SQUAW DUCK
500
500
REED BUCK
2,500
30,000
ROAN ANTELOPE
3,500
25,000
SCIMITAR HORNED ORYX
3,500
*
SING SING WATERBUCK
3,000
9,000
STELLA EIDER DUCK
250
250
TUFTED PUFFIN
500
500
Total:
$ 44,575
$ 151,275
Replacement Value
Value Assigned
Jack Perry
Larry Blomquist
ATLANTIC PUFFIN
$ 750
$ 343
BLACK DUCK
300
343
BLACK LEOPARD
9,000
4,500
COYOTE (Cub)
500
300
DORCAS GAZELLE
5,900
3,367
EIDER-COMMON
250
343
EIDER KING
250
343
GUGUINEFOWL
175
343
HARLEQUIN DUCK
250
343
HARTEBEEST SENEGAL
6,800
*
LION
12,000
10,000
LORD DERBY ELAND
14,000
10,000
MOOSE SHIRAS
7,200
7,000
MURRE DUCK
250
343
NUTRIA
300
610
OLD SQUAW DUCK
500
343
REED BUCK
5,700
3,500
ROAN ANTELOPE
5,000
5,000
SCIMITAR HORNED ORYX
*
*
SING SING WATERBUCK
6,700
*
STELLA EIDER DUCK
250
343
TUFTED PUFFIN
500
343
Total:
$ 76,575
$ 47,707
*626 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Attached hereto as appendix is a list of the items which petitioner claims he donated to the State of Louisiana. The items consist of animal trophies. The trophies are listed by the year in which petitioner claims he made the donation. Also listed is the value petitioner assigned to the individual trophies for purposes of computing the charitable contribution deduction (as determined by petitioner's appraiser Brian Gaisford), the estimated cost of acquiring the trophies (e.g., replacement cost) as determined by petitioner's expert Jack Perry, the appraisal value assigned to the individual trophies by Mr. Perry, and the appraisal value assigned to the individual trophies by respondent's expert Larry Blomquist.↩
3. Respondent now stipulates that petitioners made deductible cash contributions identified as "Misc. Contributions" in the amounts of $ 2,154 and $ 612 for the taxable years 1984 and 1985, respectively, and deductible cash contributions identified as "From K-1 Entity," in the amounts of $ 3,817 and $ 4,664 for the taxable years 1984 and 1985, respectively.↩
*. Due to the maximum allowable deduction limitation, petitioners only deducted $ 107,453 on Schedule A of their 1984 income tax return. The excess, $ 93,826, was carried forward to petitioners' 1985 taxable year. As a result of the carryforward of the $ 93,826, petitioners only deducted $ 177,355 on Schedule A of their 1985 income tax return. Therefore, the total amount deducted was only $ 2,411,118.↩
4. Edwin W. Edwards held the office of Governor for the State from May of 1972 to March of 1980 and from March of 1984 to March of 1988.↩
5. The copy of the letter in the record does not contain a list of animals.↩
6. The document also states that if the donations purportedly made in earlier years are "declared invalid, null, void or of no effect in any manner whatsoever," then the document serves to effectuate a "manual gift" as of the date of its execution. Petitioners conceded at trial and on brief that this document did not effectuate a donation in 1984. ↩
7. The record contains no "Donation Inter Vivos" or any other document purporting to effectuate the donations which petitioner claims to have made during 1984.↩
8. Respondent acknowledged that petitioner satisfied the first element but argues that elements 2 through 6 were not satisfied. Because of our findings regarding elements 4 through 6, we will not address elements 2 and 3.↩
9. La. Civ. Code Ann. art. 1542↩ (West 1985) provides in part: "If the donee be of full age, the acceptance may be made * * * in his name by his attorney in fact having * * * a general power to accept the donations that have been or may be made." 10. La. Civ. Code Ann. art. 2992 (West 1985) provides in part: "A power of attorney may be given * * * verbally, but of this testimonial proof is admitted only conformably to the title: Of Conventional Obligations↩." 11. La. Civ. Code Ann. art. 1846↩ (West 1985) provides in part: "If the price or value [of the subject matter of the contract] is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances." Art. 1846 was previously codified as art. 2277, but was reenacted as art. 1846 by 1984 La. Acts 331, effective Jan. 1, 1985.
12. The fact that we give no weight to the State court's judgment does not in any way indicate that we disagree with the court's resolution of the issues before it. The State court judge testified that he believed the State was contractually bound by Governor Edwards' signature on the 1984 Donation Inter Vivos and, therefore, was precluded from denying the facts stated therein.↩
13. At trial, petitioners' counsel indicated that the 1984 Donation Inter Vivos was not effective to convey property in 1984. On brief, petitioners state: Petitioners' counsel has already conceded that the Notarial Act of Donation dated December 29, 1984 was effective only in confirming that the prior donations had been made in the years recited therein, being 1979, 1981, 1982 and 1983 (the year 1979 not being before this Court) and that this Act of Donation was not effective to cause a donation in 1984 to the animals petitioners' contend were donated in prior years.↩
14. La. Civ. Code Ann. art. 1468 (West 1985) provides: "A donation inter vivos↩ (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it."
15. La. Civ. Code Ann. art. 2478↩ (West 1985) provides in part: "The tradition or delivery of movable effects takes place * * * by the bare consent of the parties, if the things can not be transported at the time of sale."
16. The parties have not addressed on brief whether these limitations apply to donations as opposed to sales.↩
17. Petitioners also presented the testimony of Brian Gaisford. On brief, petitioners argue that Mr. Gaisford did not employ a reliable method of valuation for the years 1982 through 1985. Petitioners maintain that Mr. Gaisford accurately determined the cost of replacing the trophies donated in 1981, and in many instances, these determinations are consistent with Mr. Perry's.↩
18. See Provitola v. Commissioner, T.C. Memo 1990-523 n.10, 1990 Tax Ct. Memo LEXIS 576, 60 T.C.M. (CCH) 939↩, 943 n.10, T.C.M. (RIA) 90523 at 90-2559, and cases cited therein, on appeal (11th Cir. May 7, 1991).
19. On brief, respondent concedes that he first raised this issue after trial, and he properly assumes that he has the burden of proof. ↩
20. Jack Perry was the only expert to properly include cost of hunt in his replacement costs determination for the taxable year 1985.↩
21. La. Civ. Code Ann. art. 3005↩ (West 1985) provides in part that an agent "is bound to restore to his principal whatever he has received by virtue of his procuration."
22. We note that in Cupler v. Commissioner, 64 T.C. 946 (1975), respondent conceded that both the out-of-pocket expenses and the value of the donated property were deductible. Cupler v. Commissioner, supra↩ at 954 n.3. Thus, not only is the specific factual issue of whether the taxpayer rendered services to the charitable entity when he incurred his expenses not resolved, but it appears that the parties did not even argue this issue.
23. We note that even if petitioner had substantiated his expenses, his deduction would not amount to more than a few dollars. This is because petitioner could only deduct those expenses incurred in connection with the care and maintenance of the animals donated in 1985 as that is the only year in which we found a valid donation. Moreover, because this donation occurred on December 30, 1985, petitioner could only deduct the expenses which were incurred on December 31, 1985.↩
24. Respondent concedes that petitioners did not overvalue the property purportedly donated in 1982 and 1985.↩
*. Did not value. ↩
**. Appraised as a group.↩
*. Did not value. ↩
*. Did not value. ↩
*. Did not value. ↩
*. Did not value. ↩